# EXHIBIT A

# MAYER·BROWN

Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101

Main Tel (202) 263-3000
Main Fax (202) 263-3300
www.mayerbrown.com

**Andrew J. Pincus**
Direct Tel (202) 263-3220
Direct Fax (202) 263-5220
apincus@mayerbrown.com

October 6, 2009

James H. Thessin, Esquire
Deputy Legal Advisor
United States Department of State
2201 C Street, N.W., Room 6421
Washington, D.C. 20520

Re:  U.S. Training Center, Inc.—WPPS Contract—
Request for Westfall Act Certification in *Brady, et al. v. Xe Services LLC, et al.*, No. 09-cv-18387
(N.C. Superior Court, filed Sept. 15, 2009)

Dear Mr. Thessin:

A civil lawsuit was filed on September 15, 2009, in the North Carolina General Court of Justice, Superior Court Division arising out of the WPPS contract between the State Department and United States Training Center, Inc. ("USTC"). The case is captioned *Brady, et al. v. Xe Services LLC, et al.* (No. 09-cv-018387). We represent all of the corporate defendants and Erik Prince,[1] and are writing to seek on certification under the Westfall Act, 28 U.S.C. § 2679. In accordance with the regulations promulgated by the Attorney General, which set forth the procedures for seeking certification (*see* 28 C.F.R. §§ 15.1–15.4), attested copies of the complaint and summonses are enclosed with this letter as Exhibit A. *See id.* § 15.2(a). Please consider this letter a formal request for certification under the regulations.

The complaint arises out of an incident that allegedly occurred in Iraq on September 16, 2007. According to the complaint, on that date, the "Raven 23" convoy, which included the ICs named as defendants in the complaint, "set up a blockade at Nisur Square to stop civilian traffic from flowing through the traffic circle" in order to support various other "personal protective personnel operating in Baghdad." Complaint ¶¶ 69–72. The ICs allegedly "opened fire on a white Kia sedan which had been approaching the traffic circle from the south." *Id.* ¶ 74. As the incident continued, the Raven 23 convoy also allegedly fired at others in the area. *Id.* ¶ 78. The plaintiffs are six individuals who were allegedly injured and the administrator for the estates of three individuals who were allegedly killed in the incident. *Id.* ¶¶ 10–19, 79–89.

---

[1] The other defendants, whom we do not represent, are Donald Wayne Ball, Dustin L. Heard, Evan Shawn Liberty, Jeremy P. Ridgeway, Nicholas Abram Slatten, and Paul Alvin Slough (the "ICs"). These individuals all provided security services pursuant to USTC's contract with the State Department.

Mayer Brown LLP operates in combination with our associated English limited liability partnership
and Hong Kong partnership (and its associated entities in Asia).

The complaint sets forth five claims against the corporate defendants and Mr. Prince: vicarious liability for wrongful death and personal injury under North Carolina law, vicarious liability for wrongful death and personal injury under Iraqi law, direct liability for wrongful death and personal injury based on a theory of negligent supervision under North Carolina law, direct liability for wrongful death and personal injury based on a theory of negligent retention under North Carolina law, and punitive damages under North Carolina law. (These are the Fifth through Ninth Claims for Relief. The initial four Claims are asserted only against the ICs.)

As you are aware, Westfall Act certification and substitution of the United States as the defendant is available (1) to statutory "employees of the government" (2) for acts undertaken within the scope of employment. *See* 28 U.S.C. § 2679(b)(1).

The issues of whether the State Department control over the ICs in Iraq satisfies the standard for employee status under the Westfall Act—and of whether Westfall Act immunity extends to liability claims based on the conduct of ICs in Iraq—have already been the topic of several submissions by us in connection with various other complaints arising out of USTC's work pursuant to the WPPS Contract. These submissions include letters to you of December 21, 2007, December 28, 2007, May 21, 2009, June 12, 2009, June 24, 2009, July 9, 2009, September 21, 2009, and September 23, 2009, as well as our April 3, 2008 submission to the Department of Justice (which our May 21, 2009 letters attached and incorporated by reference). We will not recapitulate our arguments why that standard is satisfied and why the corporate defendants and Mr. Prince should therefore be entitled to employee status under the Westfall Act as well. Those arguments are set forth in detail in the April 3, 2008 submission (at pp. 3–14), and are incorporated by reference herein.

The second requirement for Westfall Act certification is that the tortious conduct alleged as the basis for recovery have occurred within the scope of employment. The scope of employment determination is ordinarily based on the law of the place where the act or omission at issue occurred. *See, e.g., Johnson v. Carter*, 983 F.2d 1316, 1322 (4th Cir. 1993), *overruled on other grounds by Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995). When that determination would require the application of foreign law, however, courts in the Fourth Circuit apply the law of the forum state. *See Gutierrez de Martinez v. D.E.A.*, 111 F.3d 1148, 1156 (4th Cir. 1997). Thus, in this case, North Carolina law governs.

North Carolina law regarding the scope of employment is similar to the law in Virginia, (where other actions are pending against USTC), and indicates that intentional, criminal acts can be within the scope of employment. *See, e.g., Carawan v. Tate*, 280 S.E.2d 528, 531 (N.C. App. 1981). As the complaint notes, the alleged actions undertaken by the Raven 23 convoy occurred while engaged in a mission to support other security personnel operating in Baghdad. Complaint

Mr. James H. Thessin
October 6, 2009
Page 3

¶ 69. The scope of employment standard is therefore satisfied for the reasons explained in our previous submissions to you, which again are incorporated herein by reference.[2]

We would be happy to provide more information or to meet with you to discuss this matter at your convenience.

Sincerely,

*Andrew Pincus*

Andrew J. Pincus

Enclosures

cc: Jennifer Toole, U.S. Department of State
Phyllis Pyles, U.S. Department of Justice
R. Joseph Sher, Office of the United States Attorney for the Eastern District of Virginia

---

[2] The allegation that the Raven 23 convoy acted "[i]n complete contravention of their authorization under the WPPS contract" (Complaint ¶ 72) does not change this result; as we have previously indicated, "[i]f the act of the employee was a means or method of doing that which he was employed to do, though the act be wrongful and unauthorized or even forbidden, the employer is liable for the resulting injury." *Wegner v. Delly-Land Delicatessen, Inc.*, 153 S.E.2d 804, 808 (N.C. 1967) (cited in April 3, 2008 Letter to DOJ, at 16–17); *see also Carawan*, 280 S.E.2d at 530–31 (parking lot attendant who pointed gun at plaintiff and threatened to shoot if plaintiff did not pay a $3 parking fee could have been acting within scope of employment).

Poyner Spruill LLP

October 8, 2009

Keith H. Johnson
*Partner*
D: 919.783.1013
F: 919.783.1075
kjohnson@poynerspruill.com

James H. Thessin, Esquire
Deputy Legal Advisor
United States Department of State
2201 C Street, N.W., Room 6421
Washington, D.C. 20520

Re:   Request for Westfall Act Certification in *Brady, et al. v. XE Services LLC, et al.*, No. 09-cv-18387 (N.C. Superior Court, Wake County, filed Sept. 15, 2009)

Dear Mr. Thessin:

    We represent Donald Wayne Ball, Dustin L. Heard, Evan Shawn Liberty, Nicholas Abram Slatten, and Paul Alvin Slough, respectively, all of whom have been named as defendants in the above-captioned lawsuit pending in North Carolina state court. Each of these five individuals entered into an "Independent Contractor Service Agreement" with Blackwater/Xe, pursuant to which they performed security services in Iraq under a contract between the U.S. State Department and Blackwater/Xe (hereinafter, these defendants collectively will be referred to as the "ICs"). We are writing on behalf of these individuals to formally request certification under the Westfall Act, 28 U.S.C. § 2679. In accordance with the regulations promulgated by the Attorney General, which set forth the procedures for seeking certification (*see* 28 C.F.R. §§ 15.1–15.4), an attested copy of the complaint and summonses are enclosed with this letter. *See id.* § 15.2(a). (Only a single copy of the complaint is enclosed, because the complaint served on each of the ICs was identical.)

    The complaint arises out of an incident that allegedly occurred in Iraq on September 16, 2007. According to the complaint, on that date, the "Raven 23" convoy, which included the ICs, "set up a blockade at Nisur Square to stop civilian traffic from flowing through the traffic circle" in order to support various other "personal protective personnel operating in Baghdad." Complaint ¶¶ 70–72. The ICs allegedly "opened fire on a white Kia sedan which had been approaching the traffic circle from the south." *Id.* ¶ 74. As the incident continued, the Raven 23 convoy also allegedly fired at others in the area. *Id.* ¶ 78. The plaintiffs are six individuals who were allegedly injured and the administrators for the estates of three individuals that were allegedly killed in the incident. *Id.* ¶¶ 10–19, 79–89.

    The complaint sets forth five tort claims against the ICs: wrongful death under North Carolina law; an alternative wrongful death claim under Iraqi law; a claim for negligence causing personal injury under North Carolina law; an alternative claim for negligence causing personal injury under Iraqi law; and a claim for punitive damages. (These are the First, Second, Third, Fourth, and Ninth Claims for Relief in the complaint. The remaining four Claims are asserted only against other defendants.)

James H. Thessin, Esq.
Deputy Legal Advisor
United States Department of State
October 8, 2009
Page 2

Poyner Spruill[LLP]

Westfall Act certification—which results in removal to federal court and substitution of the United States as the defendant—is required when: (1) a statutorily defined "employee[] of the government" is sued, (2) for allegedly tortious acts undertaken within the scope of employment. *See* 28 U.S.C. § 2679(b)(1). As explained in further detail below, both of these factors are satisfied in this case.

## I.  The ICs Were Employees of the Government

For purposes of the Westfall Act, the term "[e]mployee of the government" is defined to include "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. Federal contractors can be "[e]mployee[s] of the government" for purposes of the Act. *See, e.g., Patterson & Wilder Constr. Co. v. United States*, 226 F.3d 1269 (11th Cir. 2000); *United States v. Becker*, 378 F.2d 319 (9th Cir. 1967); *Maryland v. Manor Real Estate & Trust Co.*, 176 F.2d 414 (4th Cir. 1949); *Costa v. United States*, 845 F. Supp. 64 (D.R.I. 1994).

There are two circumstances in which a contractor will be considered a government employee for purposes of the Westfall Act: "if the Government enjoys the power to control the detailed physical performance of the contractor, *or* if the Government in fact supervises the day-to-day operations." *B&A Marine Co.*, 23 F.3d at 713 (internal citations and quotation marks omitted, emphasis in original) (citing *United States v. Orleans*, 425 U.S. 807, 814–15 (1976); *Logue v. United States*, 412 U.S. 521, 528 (1973)). In other words, it is not necessary that the Government continually control all aspects of the [contractor's] activities, so long as it has the authority to do so given the nature of the task." *Patterson & Wilder Constr. Co.*, 226 F.3d at 1274.

In this case, both circumstances are present. The government had the right to control, and did in fact control, the ICs' performance. The ICs were hired, trained, and conducted security missions in accordance with detailed specifications from the State Department. Among other things, the contract documents governing the relationship between the State Department and Blackwater/Xe establish the following:

- The ICs' resumes were sent to the State Department for pre-screening, and the State Department reserved the right to prevent the ICs from providing security services in Iraq. *See* Worldwide Professional Personal Security ("WPPS") II Contract § C, ¶ 4.3.1 & App. F.

- The State Department required that the ICs pass psychological, medical, and dental exams, background checks, drug testing, and security clearances, and that the ICs be subjected to monitoring for stability and performance during training. *See id.* § C, ¶ 4.3.1.2, App. E & App. F; Task Order Request 2006-06, ¶ 6.5; Task Order Proposal 2006-06, at 54.

2

James H. Thessin, Esq.
Deputy Legal Advisor
United States Department of State
October 8, 2009
Page 3

Poyner Spruill<sup>LLP</sup>

- The ICs were required to undergo a 164-hour intensive training regimen that was based on over 500 pages of detailed specifications from the State Department and approved by the Department after a full, on-site demonstration. *See* WPPS II Contract § C, App. G. The State Department even specified the precise facilities to be used for training—itemizing, for example, how many pieces of furniture were required to be in the rooms of a building used in live-fire simulation exercises. *See id.*

- Based on the State Department specifications, the ICs were required to demonstrate knowledge of and/or proficiency in, among other things: (a) the functions of fourteen separate persons operating within a protective detail; (b) at least six different types of protective formations; (c) proper formations and positioning during different types of events, such as arrivals, departures, speeches, press conferences, and motorcades; (d) how to respond to specific types of attacks on protectees; and (e) various survival skills and defensive tactics. *See* WPPS II Contract § C, App. G, Attach. 5; Task Order 2006-06 Proposal ¶¶ 4.0–4.7, 4.12.

- The ICs were required to satisfy specific criteria established by the State Department to be authorized to handle weapons. *See, e.g.*, WPPS II Contract § C, App. G, Attach. 7–9; *id.* § C, App. N. The training had to be at least as rigorous as that provided to the Department's own security personnel. *Id.* § C, App. G, § 5.3.1; *id.* § C, App. U (incorporating syllabus for the State Department's Field Firearms Officer course); Task Order 2006-06 Proposal ¶ 2.10.

- The State Department-issued Tactical Standard Operating Procedure ("TacSOP") defined in exhaustive detail the procedures to be followed by the ICs while protecting government officials as they traveled to and from meetings throughout Baghdad, and made clear that the State Department determined "how missions are conducted within Iraq." TacSOP, at iv. Among other things, the TacSOP enumerated the duties of each IC involved in the mission (TacSOP, Ch. 1, pp. 6-8), established highly detailed communications procedures (TacSOP, Ch. 2), and prescribed the information to be covered in pre-mission briefings (TacSOP, App. A).

- The ICs were required to abide by the State Department's Deadly Force Policy and the Mission Firearms Policy issued by the U.S. Ambassador to Iraq, each of which contained detailed rules governing when and how ICs were permitted to use their weapons. *See* WPPS II Contract, § C, App. P; *id.* at Mission Firearms Policy.

- The State Department had control over each security mission. The State Department's Regional Security Office ("RSO") was specifically authorized to make tactical decisions regarding all aspects of each mission. *See* Task Order Request 2006-06 ¶ 6.1 (providing, *inter alia*, that "[a]ll personnel shall work under the direction of the RSO Baghdad" and that "[s]pecific detail size and complement will be based upon a security assessment of the area in which protection is to be provided and as directed by RSO"); *see also* TacSOP, Ch. 3, at 4 (granting the RSO initial mission approval authority and requiring RSO approval of changes

James H. Thessin, Esq.
Deputy Legal Advisor
United States Department of State
October 8, 2009
Page 4

Poyner Spruillᴸᴸᴾ

to missions); *id.* Ch. 6, at 2 (Department authority to approve missions and assign personnel). The contract expressly placed all missions "under the daily oversight of the RSO or the RSO's designee." Task Order Request 2006-06 ¶¶ 6.0-6.1; *see also* WPPS II Contract § C, ¶ 1.5.3 (RSO exercises "on-site authority over the Contractor's [protective services] detail"). The contract mandated that each security mission "maintain[] constant communication with RTOC"—the Regional Tactical Operations Center, where the State Department RSO was stationed—"and notif[y] RTOC of any changes in status, route checkpoints, or other pertinent information." TacSOP, Ch. 3, at 4.

- The State Department determined how many and what type of ICs were assigned to particular missions, the defensive formations they were required to assume, and the circumstances under which they were permitted to use deadly force. *See, e.g.*, Task Order Request 2006-06 ¶ 6.1 (providing that "[s]pecific detail size and complement will be based upon a security assessment of the area in which protection is to be provided and as directed by [the State Department's Regional Security Office]"); TacSOP, Ch. 6, at 2 (requiring use of the "Strong Side Drop (Diamond Formation)" when delivering protectees to sites in Baghdad's International Zone); WPPS II Contract, Mission Firearms Policy, at 9 (establishing "Rules of Engagement" defining "permissible uses of deadly force").

On these facts, it is clear that the government not only "enjoy[ed] the power to control the detailed physical performance of" the ICs, but also "in fact supervise[d] the[ir] day-to-day operations." *B&A Marine Co.*, 23 F.3d at 713. Accordingly, the ICs were "[e]mployee[s] of the government" for purposes of the Westfall Act. *Cf. Becker*, 378 F.2d at 322–23 (affirming determination that contractor that "operated under the detailed control and direction of the Forest Service" was a government employee); *Pervez v. United States*, 1991 WL 53852, at *5 (E.D. Pa. Apr. 9, 1991) (holding that employment relationship between contractor and government was established where contractor's actions were "under the daily supervision, direction, and control of the United States"); *Ferguson v. United States*, 712 F. Supp. 775, 780 (N.D. Cal. 1989) (finding employment relationship where "[t]he authority of the United States to 'control' the actions of [the contractor] is [] set forth in ... the contract"); *Motors Ins. Co. v. Aviation Specialties, Inc.*, 304 F. Supp. 973, 977 (W.D. Mich. 1969) (finding private contractor to be an employee for FTCA purposes where "United States Department of Agriculture employees had complete and exclusive control of [the contractor's] activities in the execution of the contract").

## II. The ICs Were Acting Within the Scope of Their Employment

As explained below, the ICs alleged actions were also within the scope of the ICs' employment by the government.

The scope of employment determination for Westfall Act purposes is ordinarily based on the law of the place where the act or omission at issue occurred. *See, e.g., Johnson*, 983 F.2d at 1322. When that determination would require the application of foreign law, however, courts in

James H. Thessin, Esq.
Deputy Legal Advisor
United States Department of State
October 8, 2009
Page 5

Poyner Spruill<sup>LLP</sup>

the Fourth Circuit apply the law of the forum state. *See Gutierrez de Martinez v. D.E.A.*, 111 F.3d 1148, 1156 (4th Cir. 1997). Thus, in this case, North Carolina law will govern the scope-of-employment determination.

Under North Carolina law, intentional torts, even those that constitute criminal acts, may be within the scope of employment. *See, e.g., Carawan v. Tate*, 280 S.E.2d 528, 531 (N.C. App. 1981). Though there is no uniform test for scope-of-employment determinations, the analysis typically hinges on: (1) whether the employee's actions were naturally incident to the employee's duties; and (2) whether the employee's actions, even if unauthorized or forbidden, were performed with the intent to further the employer's business. *See, e.g., Wegner v. Delly-Land Delicatessen, Inc.*, 153 S.E.2d 804, 807–08 (N.C. 1967) ("If the act of the employee was a means or method of doing that which he was employed to do, though the act be wrongful and unauthorized or even forbidden, the employer is liable for the resulting injury.").[1]

The conduct that forms the basis of the complaint in this case satisfies both of these factors. *First*, the conduct was "incidental to the work [the ICs] were employed to do." *Wegner*, 153 S.E.2d at 808. The use of deadly force to protect government officials was expressly contemplated by the State Department, as is evidenced both by the State Department's Deadly Force Policy and by the nature of the training that the State Department mandated. Even if the use of force was improper in the incident at issue here, such an occurrence unfortunately is naturally incident to the provision of security in an extremely dangerous, highly volatile, and heavily armed environment such as Baghdad.

*Second*, the alleged acts were performed with the intent to further the employer's business of protecting government officials. *See Wegner*, 153 S.E.2d at 807–08. At the time of the alleged incident, the ICs were engaged in providing support to a security mission. The conduct at issue here was far more consistent with the employer's interests than the conduct of employees that, despite its egregious nature, has been found to be within the scope of

---

[1] This is similar to the standard in Virginia, where other actions arising out of the contract between the State Department and Blackwater/Xe are pending in federal court. *See, e.g., Tye v. Costco Wholesale*, 2005 WL 1667597, at *5 (E.D. Va. 2005) ("The doctrine of *respondeat superior* even extends to situations in which an employee has committed an intentional, even criminal, tortious act.") (applying Virginia law); *Johnson*, 983 F.2d at 1322 ("In Virginia an act is deemed to be within the scope of employment if: '(1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account.'") (applying Virginia law, and quoting *Kensington Assocs. v. West*, 362 S.E. 2d 900, 901 (Va. 1987)).

James H. Thessin, Esq.
Deputy Legal Advisor
United States Department of State
October 8, 2009
Page 6

Poyner Spruill<sup>LLP</sup>

employment under North Carolina law. *See, e.g., Carawan*, 280 S.E.2d at 530–31 (parking lot attendant who drew pistol, pointed it at plaintiff's face, and threatened to shoot plaintiff if he did not pay a $3 parking fee could have been acting within scope of employment); *Munick v. Durham*, 106 S.E. 665, 667 (N.C. 1921) (holding that city employee was acting within scope of employment when the employee assaulted a customer who paid a portion of his water bill in pennies).[2]

\* \* \*

Accordingly, because the ICs were government employees acting within the scope of their government employment at the time of the incident giving rise to the complaint, certification under the Westfall Act is warranted.

Please do not hesitate to contact us if you have any questions or need any additional information. We would also be happy to meet with you at your convenience to discuss this matter further.

Sincerely,

*Keith H. Johnson*

Keith H. Johnson
Attorney for Donald Wayne Ball, Dustin L. Heard,
Evan Shaw Liberty, Nicholas Abram Slattan and
Paul Alvin Slough

KHJ:kks
Enclosure

cc:  Jennifer Toole, U.S. Department of State (w/encl.)
     Phyllis Pyles, U.S. Department of Justice (w/encl.)
     R. Joseph Sher, Office of the United States Attorney for the Eastern District of Virginia (w/encl.)

---

[2] Virginia courts have found similar conduct to be within the scope of employment. *See, e.g., Doyle-Penne v. Muhammad*, 229 F.3d 1142 (Table), 2000 WL 1086906, at \*1 (4th Cir. 2000) (per curiam) (unpublished) (holding that employee's act of "pinning her [coworker] against an office wall and repeatedly punching her in the chest" was within the scope of employment when it occurred in the office during the normal workday and arose out of a work-related altercation) (applying Virginia law); *Plummer v. Center Psychiatrists, Ltd.*, 476 S.E.2d 172, 175 (Va. 1996) (psychologist's forced sexual intercourse with patient could be within scope of employment since it occurred during counseling session).