# ADDENDUM

# UNPUBLISHED CASES





H
Only the Westlaw citation is currently available.

United States District Court,
W.D. North Carolina.
Vance **SOUTHARD**, Plaintiff,
v.
Michael D'AMELIO, Defendant.
**No. Civ.A. 3:03CV505.**

Dec. 2, 2004.

Koy E. Dawkins, Monroe, NC, for Plaintiff.

Bradley R. Kutrow, Charlotte, NC, Samuel M. Starr, Hillary F. Meltz, Lisa A. Tenerowicz, Boston, MA, for Defendant.

*MEMORANDUM AND RECOMMENDATION*

KEESLER, Magistrate J.

***1** THIS MATTER IS BEFORE THE COURT on the Defendant's "Motion to Dismiss Based on Lack of Personal Jurisdiction, or in the Alternative, to Transfer Venue to Massachusetts" (Document No. 9), "Memorandum in Support ..." (Document No. 11), "Affidavit of Kevin M. McGinty in Support ..." (Document No. 10) and "Affidavit of Michael D'Amelio in Support ..." (Document No. 12), filed October 27, 2003; the Plaintiff's "Memorandum ... in Opposition ..." (Document No. 20), "Affidavit of M.W. Glover in Opposition ..." (Document No. 17), and "Affidavit of Vance Southard in Opposition ..." (Document No. 19), filed November 21, 2003; Plaintiff's "Amended Affidavit of Vance Southard in Opposition ..." (Document No. 21), filed December 4, 2003; Defendant's "Reply Memorandum in Further Support ..." (Document No. 22), "Supplemental Affidavit of Kevin M. McGinty in Support ..." (Document No. 23), and "Affidavit of G. Lawrence Bero in Support ..." (Document No. 24), filed December 8, 2003; and Plaintiff's "Motion for Leave to File Sur-Reply in Opposition ..." (Document No. 25) and "Sur-Reply in Opposition ..." (Document No. 26), filed December 17, 2003.[FN1]

FN1. Defendant responded by letter, dated December 23, 2003, to the Plaintiff's "Motion for Leave to File Sur-Reply" and "Sur-Reply."

The instant motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and are ripe for disposition.

Having considered the written arguments, the record, and applicable authority, the undersigned respectfully recommends that Defendant's "Motion to Dismiss Based on Lack of Personal Jurisdiction, or in the Alternative, to Transfer Venue to Massachusetts" (Document No. 9) be *granted in part and denied in part*, that is, that the motion to dismiss based on lack of personal jurisdiction be granted and the motion, in the alternative, to transfer venue to Massachusetts be denied as moot.

## I. FACTUAL AND PROCEDURAL HISTORY [FN2]

FN2. For the purposes of this motion to dismiss, all relevant pleading allegations are taken-and the factual recitation here is made-in the light most favorable to Mr. Southard. *CEM Corp. v. Personal Chemistry AB,* 192 F.Supp.2d 438, 440 (W.D.N.C.2002) (citation omitted).

In 1993, while Michael D'Amelio was the president of TACC International Corporation ("TACC") and Vance Southard was employed as the Regional Sales Manager for Continental Brands Corporation ("Continental"), certain assets of Continental were purchased by TACC. In connection with that acquisition, TACC issued shares of "phantom stock"

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

under a compensation plan to select Continental and TACC employees (the "Phantom Stock Plan"). Mr. Southard received ninety-one phantom shares pursuant to the Phantom Stock Plan, dated October 5, 1993, between Mr. Southard and TACC. The Phantom Stock Plan provided, in pertinent part, that:

[i]n the event of a sale of TACC ... to an outside party, the value of the Phantom units will take on the value as assigned to the Common Stock in the sale. The payout to the holder of the Phantom units will be on the same basis as the terms of the sale of the Common Stock.

Pursuant to a Stock Purchase and Sale Agreement, dated September 17, 1998 (the "Sale Agreement"), TACC sold all of its outstanding stock to Illinois Tool Works ("Tool Works") for a purchase price of $130 million, $4 million of which was to be held in escrow and payable only if TACC achieved certain EBITDA targets for the fiscal year ended June 30, 1999 (the "Escrowed Funds"). The Sale Agreement also contained a provision for a contingent purchase price payment (the "Contingent Payment") of up to $20 million if TACC exceeded certain financial plan objectives with respect to revenues, margins and EBITDA for the fiscal year ended June 30, 1999.

**\*2** The sale of TACC to Tool Works was announced at a meeting on September 19, 1998. After the meeting, Mr. D'Amelio and Mr. Southard discussed the redemption of Mr. Southard's phantom stock. According to Mr. Southard, Mr. D'Amelio told him that payment for his phantom stock would be wired to his account in North Carolina on the following Monday or Tuesday. Mr. D'Amelio did not tender any funds to Mr. Southard at that time.

In November 1998, Mr. D'Amelio sent to Mr. Southard in North Carolina a proposed agreement cancelling the phantom stock along with an ownership table showing that Mr. Southard's phantom stock was valued at $220,167.00. Mr. Southard traveled to Massachusetts to meet with Mr.

D'Amelio regarding the proposed agreement and ownership table. Mr. D'Amelio did not provide any documentation supporting the ownership table to Mr. Southard.

In December 1998, Mr. D'Amelio faxed to Mr. Southard in North Carolina a revised version of the proposed agreement cancelling the phantom stock along with a distribution table showing that Mr. Southard's stock was valued at $371,296.00. Mr. D'Amelio also asked Mr. Southard to sign a confidentiality agreement before Mr. D'Amelio provided any supporting documentation. Mr. Southard refused to sign the confidentiality agreement because, according to Mr. Southard, the agreement referenced the wrong corporation.

In January 1999, Mr. Southard contacted David Flood, Executive Vice President for Tool Works. According to Mr. Southard, Mr. Flood agreed to contact Mr. D'Amelio regarding Mr. Southard's phantom stock. Later the same day, Mr. D'Amelio called Mr. Southard in Mr. Southard's Monroe, North Carolina office. According to Mr. Southard, Mr. D'Amelio was angry that Mr. Southard had contacted Mr. Flood. Mr. D'Amelio nonetheless sent some documentation to Mr. Southard.

Mr. Southard sent the documentation to his accountant, M.W. Glover, C.P.A., C.V.A., of the Monroe, North Carolina firm of Potter & Co., P.A. and asked Mr. Glover to perform as complete an analysis as possible of the value of Mr. Southard's phantom stock. Based on that documentation, Mr. Glover calculated the value of Mr. Southard's phantom stock as $3,528,000.00 with possible additional contingency payments of $112,000.00 of the Escrowed Funds and $560,000.00 of the Contingent Payment.

Mr. Southard faxed Mr. Glover's evaluation to Mr. D'Amelio in his Massachusetts office. After Mr. D'Amelio received the fax, Mr. D'Amelio called Mr. Southard in his Monroe, North Carolina office. During that conversation, Mr. D'Amelio and Mr. Southard were unable to reach an agreement on the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

value of the phantom stock.

At some later point, Mr. Southard called Mr. Flood once again. Mr. Flood told Mr. Southard that Mr. Flood was meeting with Mr. D'Amelio on a separate matter and would discuss the phantom stock issue with him.

After Mr. Flood and Mr. D'Amelio met, Mr. D'Amelio telephoned Mr. Southard. Although Mr. Southard and Mr. D'Amelio disagree as to who initiated the trip and when that trip occurred, it is undisputed that after the telephone call, Mr. D'Amelio traveled to North Carolina to meet with Mr. Glover and Mr. Southard. According to Mr. Southard, Mr. D'Amelio offered to travel to North Carolina. Regardless, Mr. Southard picked Mr. D'Amelio up at the Charlotte airport and drove him to and from the meeting. At the meeting, Mr. D'Amelio discussed with Mr. Glover additional information regarding the value of the phantom stock. Mr. Southard and Mr. D'Amelio also discussed their dispute over the phantom stock during both car rides.

**\*3** In February 1999, Mr. D'Amelio faxed to Mr. Southard in North Carolina additional information regarding the value of the phantom stock. Mr. Glover, presumably using that additional information, then completed a new valuation, in which he calculated the value of Mr. Southard's phantom stock as $3,104,556.00 plus 4.96% of any Contingent Payment. Mr. Southard faxed a copy of Mr. Glover's valuation to Mr. D'Amelio in Massachusetts.

Over the next several months, Mr. Southard and Mr. D'Amelio continued to negotiate the value of the phantom stock. Eventually, Mr. Southard and Mr. D'Amelio reached a compromise and entered into a Settlement Agreement (the "Settlement Agreement"), dated May 19, 1999, which provided that Mr. D'Amelio would pay Mr. Southard $2,238,400 by wire transfer into Mr. Southard's bank account in North Carolina and would furnish certain documents to Mr. Southard. The Settlement Agreement further provided that Mr. Southard

would be entitled to (i) up to $161,600 of the Escrowed Funds pursuant to the Sale Agreement and (ii) ten percent of any Contingent Payment pursuant to the Sale Agreement. Mr. Southard and TACC, with Mr. D'Amelio signing on its behalf, also entered into a Cancellation Agreement (the "Cancellation Agreement"), also dated May 19, 1999, which provided that the phantom stock be cancelled.

Mr. D'Amelio executed the Settlement Agreement and the Cancellation Agreement at his office in Massachusetts and then sent the agreements to Mr. Southard's attorney by first class mail. Pursuant to the Settlement Agreement, Mr. Southard received $2,239,400 by wire transfer from a bank account belonging to Mr. D'Amelio and located in Massachusetts.

At the time for any payment of the Escrowed Funds and the Contingent Payment, a dispute arose between Mr. D'Amelio and the other former TACC shareholders, on one hand, and Tool Works, on the other hand, with respect to whether TACC had achieved the financial targets as specified in the Sale Agreement. Mr. D'Amelio, the former TACC shareholders and Tool Works attempted to resolve their dispute through mediation, but those attempts failed. Subsequently, several lawsuits were filed, the primary one of which was styled *Michael A. D'Amelio, et al. v. ITW Finance II, L.L.C. and Illinois Tool Works, Inc.,* Civil Action No. 00-11266-RCL, in the United States District Court for the District of Massachusetts. Mr. D'Amelio and the other former TACC shareholders asserted various claims against Tool Works for its non-payment of the Contingent Payment and alleged improper retention of the Escrowed Funds. Tool Works asserted counterclaims alleging that Mr. D'Amelio and other former TACC officers fraudulently misrepresented aspects of TACC's earnings, inventory and accounts receivable, thus breaching the Sale Agreement and artificially inflating the worth of TACC.

Mr. D'Amelio, the other former TACC shareholders and Tool Works entered into a Settlement Agree-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment and Mutual General Release, dated October 31, 2002, pursuant to which (i) Tool Works retained the Escrowed Funds, including any interest earned thereon; (ii) the former TACC shareholders did not receive any Contingent Payment; and (iii) the former TACC shareholders paid an additional sum to Tool Works, over and above the Escrowed Funds.

**\*4** Mr. D'Amelio currently lives in Washington and maintains business offices in Massachusetts, Florida and Washington. Mr. D'Amelio does not currently maintain, and has never maintained, any residences, offices or bank accounts in North Carolina. Mr. D'Amelio has never paid state income taxes in North Carolina. Mr. D'Amelio has not traveled to North Carolina for any purpose since his meeting with Mr. Glover. Prior to 1991, while employed as a salesperson at TACC, Mr. D'Amelio traveled to North Carolina on business approximately twice per year.

On August 13, 2003, Mr. Southard filed a Complaint against Mr. D'Amelio in the Superior Court of Union County, North Carolina, alleging, among other things, that Mr. D'Amelio breached the Settlement Agreement. Mr. D'Amelio removed the action on October 21, 2003 and has now moved to dismiss for lack of personal jurisdiction, or in the alternative, to transfer this case to the District of Massachusetts.

## II. DISCUSSION

Mr. D'Amelio contends that the Complaint should be dismissed for lack of personal jurisdiction. In support of that contention, Mr. D'Amelio asserts that his contacts with North Carolina are insufficient to confer general or specific personal jurisdiction. He further asserts that any exercise by this Court of jurisdiction over him would be constitutionally unreasonable. Mr. Southard, of course, makes contentions to the contrary.

Rule 4(k)(1)(A) of the Federal Rules of Civil Pro-

cedure permits a federal court to exercise personal jurisdiction over a defendant in the manner provided by state law. Fed.R.Civ.P. 4(k)(1)(A); *ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 622 (4th Cir.1997). Section 1-75.4 of the North Carolina General Statutes, the statute permitting state courts to exercise personal jurisdiction over non-resident defendants, has been construed to extend personal jurisdiction over such defendants to the full extent permitted by the Due Process Clause of the United States Constitution. *Christian Sci. Bd. of Dir. of the First Church of Christ, Scientist v. Nolan,* 259 F.3d 209, 215 (4th Cir.2001). Accordingly, what would otherwise be a two-step "inquiry merges into a single issue of whether [Mr. D'Amelio] has the requisite minimum contacts with North Carolina to satisfy due process." *CEM Corp. v. Personal Chemistry AB,* 192 F.Supp.2d 438, 400 (W.D.N.C.2002).

> [W]hen a defendant's contacts with the forum state are continuous and systematic, irrespective of whether the transaction in question had sufficient contacts with the state, a court may exercise *general* personal jurisdiction over the defendant. In the absence of continuous and systematic contacts, a court may still exercise *specific* personal jurisdiction when the contacts related to the cause of action and create a substantial connection with the forum state.

*Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 450 (4th Cir.2000) (citations omitted) (emphasis in original).

### General Personal Jurisdiction

**\*5** Given the requirement that minimum contacts to support general personal jurisdiction be continuous and systematic, it is clear that the threshold to establishing general personal jurisdiction is a high one. *ESAB Group,* 126 F.3d at 623-24. Indeed, the Fourth Circuit disfavors a broad interpretation of general jurisdiction and instead restricts the exercise of such jurisdiction to those instances in which

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

there is continuous, substantial activity of a nature such as to justify suit. *Nichols v. G.D. Searle & Co.,* 991 F.2d 1195, 1199-1200 (4th Cir.1993).

In this case, it is undisputed that Mr. D'Amelio is not a resident of North Carolina and never has been. He owns no property in North Carolina and does not maintain an office or a bank account within North Carolina. He has never paid state income taxes in North Carolina. Furthermore, Mr. D'Amelio has not traveled to North Carolina for any purpose since his meeting with Mr. Glover. Mr. Southard does not, and cannot, dispute that Mr. D'Amelio's contacts with North Carolina fall far short of the continuous and systematic contacts necessary to support the exercise of general jurisdiction. For the foregoing reasons, the undersigned concludes that this Court cannot exercise general personal jurisdiction over Mr. D'Amelio. *Compare Diamond Healthcare of Ohio,* 229 F.3d 448 (holding that general personal jurisdiction could not be exercised over a corporation that owns no property in forum state, has not solicited business in forum state, and has no clients in forum state).

Specific Personal Jurisdiction

As noted above, however, a court-in the absence of continuous and systematic contacts-may still exercise specific personal jurisdiction over a defendant if the contacts relate to the cause of action asserted against the defendant and create a "substantial connection with the forum state." *Diamond Healthcare of Ohio,* 229 F.3d at 450 (citation omitted). The Fourth Circuit has summarized the standard for the exercise of specific personal jurisdiction as follows:

> [T]he test to be applied in considering whether the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies.

*Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 945-46 (4th Cir.1994).

A contract with a resident of a forum state does not necessarily evince the requisite substantial connection to the forum state, even if the dispute arises out of the contract. *Le Bleu Corp. v. Standard Capital Group,* 11 Fed. Appx. 377, 380, 2001 WL 672066, *2 (4th Cir.2001) (citing *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). Instead, the contract itself

> ***6** must have a substantial connection with the State, so that the quality and nature of a defendant's relationship to the forum can in no sense be viewed as random, fortuitous, or attenuated.

*Id.* (quotations omitted) (citing *Burger King,* 471 U.S. at 479-80). Moreover, only contacts related to the contract at issue are relevant to the specific personal jurisdiction analysis. *CEM Corp. v. Personal Chemistry AB,* 55 Fed. Appx. 621, 625, 2003 WL 122510, *3 (4th Cir.2003) (unpublished) (citations omitted).

This Court faced a factual situation in *CEM Corp. v. Personal Chemistry AB,* 192 F.Supp.2d 438, strikingly similar to the one presented by this case. In that case, the defendant's contacts with the forum state, North Carolina, consisted primarily of a trip to North Carolina to negotiate the contract, telephone calls and fax transmissions to North Carolina during the negotiations of the contract and a one-time payment pursuant to the contract to the plaintiff corporation in North Carolina. The contract itself dealt with the dismissal of litigation in Sweden, which was based upon conduct allegedly

Not Reported in F.Supp.2d, 2004 WL 3321487 (W.D.N.C.)
**(Cite as: 2004 WL 3321487 (W.D.N.C.))**

infringing a European patent. *CEM Corp., 192 F.Supp.2d at 439-440, 442*. Chief District Judge Graham Mullen reasoned that the contract at issue bore "little, if any, connection to the state of North Carolina" and "does not contemplate any ongoing performance or continuing course of dealing" between the plaintiff and the defendant. *Id. at 442-43*. He distinguished that case from those involving "some time of continuing relationship or course of dealing between the parties or between the defendant and the forum state" and cited royalty payments as one example of a continuing duty. *Id. at 443*. Accordingly, Chief Judge Mullen held that the plaintiff had failed to make a prima facie case of personal jurisdiction over the defendant and granted the defendant's motion to dismiss for lack of personal jurisdiction. *Id.* at 443-44.

The Fourth Circuit upheld that decision in an unpublished opinion, explaining that "[o]ne visit to the state, accompanied by a few telephone calls and faxes to settle litigation initiated against it in Sweden, would not put [the defendant] on notice that it should reasonably anticipate being haled into court." *CEM Corp. v. Personal Chemistry, AB,* 55 Fed. Appx. at 625, 2003 WL 122510 at *3 (internal marks omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)); *see also Le Bleu Corp.,* 11 Fed. Appx. 377, 2001 WL 672066 (affirming district court's dismissal of complaint for lack of personal jurisdiction where contract between plaintiff North Carolina corporation and defendant California corporation, pursuant to which defendant would serve as financial advisor in connection with new financing, was signed in North Carolina, defendant's employees made two visits to North Carolina, parties exchanged mail and telephone calls and a payment was mailed from North Carolina).

**\*7** In this case, Mr. Southard alleges that Mr. D'Amelio breached the Settlement Agreement, which involves the redemption of phantom stock in a corporation not domiciled in North Carolina. Mr. D'Amelio's contacts with North Carolina related to

the Settlement Agreement can be summarized as follows: Mr D'Amelio and Mr. Southard exchanged telephone calls and fax transmissions during the negotiations of the Settlement Agreement; Mr. D'Amelio traveled to North Carolina to negotiate the Settlement Agreement; the Settlement Agreement was partially executed in North Carolina; pursuant to the Settlement Agreement, Mr. D'Amelio made a one-time payment of $2,239,400, and agreed to furnish certain documents, to Mr. Southard in North Carolina; and, also pursuant to the Settlement Agreement, on a date certain, Mr D'Amelio was to pay Mr. Southard up to $161,600 of the Escrowed Funds and ten percent of any Contingent Payment.

Based on *CEM Corp. v. Personal Chemistry AB,* 192 F.Supp.2d 438, the undersigned finds that Mr. Southard has failed to make a prima facie showing of minimum contacts to support specific personal jurisdiction. *Id.* at 440 ("Where ... the court rules on a ... motion relying on the Complaint, briefs, and affidavits alone, ... the burden is on the plaintiff to make a prima facie showing that personal jurisdiction exists.") (citation omitted). The Settlement Agreement has little, if any, connection with North Carolina. Its subject is the redemption of stock in a corporation not domiciled in North Carolina. Pursuant to the Settlement Agreement, Mr. D'Amelio was required to make two discrete payments of a determinable amount. There is no ongoing stream of payments and no contemplated negotiation regarding the calculation of those payments. All conduct by Mr. D'Amelio allegedly breaching the Settlement Agreement took place in Massachusetts. Because Mr. Southard has not made a sufficient showing of minimum contacts, it is unnecessary to decide whether the exercise of jurisdiction over Mr. D'Amelio would offend traditional notions of fair play and substantial justice. *CEM Corp.,* 192 F.Supp.2d at 444 n. 3. Accordingly, the undersigned recommends that the motion to dismiss for lack of personal jurisdiction be granted and the motion, in the alternative, to transfer venue to Massachusetts be denied as moot.[FN3]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. Contrary to Mr. Southard's contentions, *Regency Lighting Corp. v. Galaxy Elec. Manuf., Inc.,* 933 F.Supp. 507 (M.D.N.C.1996), does not direct a decision to the contrary. In that case, the contract at issue called for the plaintiff to dismiss litigation pending in North Carolina against the defendant. *Id.* at 512. As such, the subject of the contract is inextricably connected to North Carolina. As the United States District Court for the Middle District of North Carolina found, that is "clear evidence" that the defendant "purposefully created a substantial connection to North Carolina." *Id.* at 512 (citation omitted).

### III. RECOMMENDATION

FOR THE FOREGOING REASONS, the undersigned respectfully recommends that Defendant's "Motion to Dismiss Based on Lack of Personal Jurisdiction, or in the Alternative, to Transfer Venue to Massachusetts" (Document No. 9) be GRANTED IN PART AND DENIED IN PART; that is, that the motion to dismiss based on lack of personal jurisdiction be granted and the motion, in the alternative, to transfer venue to Massachusetts be denied as moot.

### IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. *United States v. Ridenour,* 889 F.2d 1363, 1365 (4th Cir.1989); *United States v. Rice,* 741 F.Supp. 101, 102 (W.D.N.C.1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to *de novo* review by the district court, *Ridenour,* 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wright v. Collins,* 766 F.2d 841, 845-46 (4th Cir.1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

**\*8** The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties.

IT IS SO RECOMMENDED.

W.D.N.C.,2004.
Southard v. D'Amelio
Not Reported in F.Supp.2d, 2004 WL 3321487 (W.D.N.C.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.)))**

H
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,
Fourth Circuit.
CEM CORPORATION, Plaintiff-Appellant,
v.
PERSONAL CHEMISTRY, AB, Defendant-Appellee.
**No. 02-1369.**

Argued Dec. 3, 2002.
Decided Jan. 15, 2003.

North Carolina corporation sued Swedish corporation, alleging breach of agreement settling patent infringement litigation conducted in Sweden. The United States District Court for the Western District of North Carolina, Graham C. Mullen, Chief Judge, 192 F.Supp.2d 438, dismissed suit for lack of personal jurisdiction, and plaintiff appealed. The Court of Appeals held that: (1) parties' agreement-in-principle did not, by itself, subject defendant to specific jurisdiction in North Carolina; (2) defendant's non-litigation related contacts were insufficient to establish personal jurisdiction; and (3) defendant's actions during negotiation of agreement were insufficient to subject it to personal jurisdiction.

Affirmed.

West Headnotes

**[1] Patents 291 288(3)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k288 Jurisdiction
                291k288(3) k. Residence and Place of Infringement. Most Cited Cases
Agreement-in-principle between North Carolina patentee and Swedish alleged infringer was not sufficient, by itself, to subject infringer to specific personal jurisdiction in North Carolina in action for breach of agreement, even if agreement-in-principle was binding contract premised on licensing agreements for two European patents; licensing agreements required up-front, lump-sum payment of royalties rather than continuing or periodic royalty payments.

**[2] Patents 291 288(3)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k288 Jurisdiction
                291k288(3) k. Residence and Place of Infringement. Most Cited Cases
Swedish company that allegedly infringed North Carolina company's European patents was not subject to specific personal jurisdiction in North Carolina in action for breach of alleged settlement agreement as result of its sale of product to another company in North Carolina, seminar in North Carolina, advertisements on its website, participation in trade shows directed, in part, at North Carolina companies, and full page advertisements in various national trade publications; contacts were only tangentially related to alleged agreement.

**[3] Patents 291 288(3)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k288 Jurisdiction
                291k288(3) k. Residence and Place of Infringement. Most Cited Cases
Swedish company that allegedly infringed North

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.)))**

Carolina company's European patents was not subject to specific personal jurisdiction in North Carolina in action for breach of alleged settlement agreement as result of its actions surrounding negotiation of agreement; Swedish company merely sent its representatives on single visit to North Carolina for sole purpose of discussing settlement of patent infringement action filed against it in Sweden, involving European patent, and alleged infringing conduct occurring in Sweden, and Swedish company's outside counsel had a few telephone conversations with North Carolina company's representatives regarding settlement and, by facsimile, sent them drafts of agreement-in-principle and informed them that Swedish company's board ultimately rejected its terms.

**\*622** Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Chief District Judge. (CA-01-225-3-MU).**ARGUED:** Albert Peter Allan, Summa & Allan, P.C., Charlotte, North Carolina, for Appellant. Grady Michael Barnhill, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Charlotte, North Carolina, for Appellee. **ON BRIEF:** William C. Raper, Womble, Carlyle, Sandridge & Rice, P.L.L.C., Charlotte, North Carolina, for Appellee.

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

Affirmed by unpublished PER CURIAM opinion.

## OPINION

PER CURIAM.

**\*\*1** In December 2000, CEM Corporation, a North Carolina corporation, filed suit in Sweden against Personal Chemistry, AB, **\*623** a Swedish corporation with its principal place of business in Sweden that has never registered to do business in North Carolina. CEM alleged that Personal Chemistry infringed a European patent belonging to CEM. A month later, several employees of Personal Chem-

istry and its United States affiliate traveled to North Carolina to attempt to settle the Swedish patent infringement action with CEM officials. The two sides negotiated an "agreement-in-principle," which provided for dismissal of the Swedish litigation and a license to Personal Chemistry for the patent at issue and another European patent in exchange for a one-time payment of $700,000 by Personal Chemistry to CEM. Personal Chemistry's board of directors, however, subsequently refused to approve the agreement-in-principle.

CEM then filed the present action in North Carolina against Personal Chemistry, alleging breach of the agreement-in-principle, intentional and negligent misrepresentation, and unfair and deceptive trade practices. On Personal Chemistry's motion, the district court dismissed the action for lack of personal jurisdiction over Personal Chemistry. *See* Fed R. Civ. P. 12(b)(2). CEM now appeals.

Because the district court dismissed the complaint without conducting an evidentiary hearing, CEM was only required to make a *prima facie* showing that personal jurisdiction existed. *See Mylan Laboratories, Inc. v. Akzo, N.V.,* 2 F.3d 56, 60 (4th Cir.1993). To carry its burden, CEM had to show that (1) the North Carolina long-arm statute confers personal jurisdiction over Personal Chemistry; and (2) the exercise of personal jurisdiction over Personal Chemistry "comports with the requirements of the Due Process Clause of the Fourteenth Amendment." *Id.* As the district court noted, because the North Carolina long-arm statute extends to the limit permissible under the Due Process Clause, *Vishay Intertechnology, Inc. v. Delta International Corp.,* 696 F.2d 1062, 1065 (4th Cir.1982), CEM simply had to demonstrate that Personal Chemistry had sufficient minimum contacts with North Carolina to satisfy due process.

The Supreme Court has articulated two tests for determining whether a defendant's contacts with a forum suffice to confer personal jurisdiction over the defendant. If the cause of action does *not* arise from or relate to the defendant's activities in the forum, a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.)))**

plaintiff must prove that the defendant's contacts are "continuous and systematic" and so support the exercise of *general* personal jurisdiction over the defendant. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 415-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). If the cause of action *does* arise out of or is related to the defendant's activities within the forum, the plaintiff need only prove that a court has *specific* personal jurisdiction over a defendant by demonstrating that

**\*\*2** (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice[.]

*Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 945-46 (4th Cir.1994).

The district court dismissed CEM's complaint, finding that it failed to make the requisite showing of sufficient contacts to support either general or specific personal jurisdiction over Personal Chemistry. Although CEM apparently disagrees with both holdings, on appeal it only proffers arguments challenging the district court's **\*624** refusal to exercise specific personal jurisdiction.[FN1]

> FN1. Perhaps CEM does not mount an appellate challenge to the district court's finding of no general personal jurisdiction because it recognizes that such an argument would be fruitless. The requirement that a plaintiff seeking to establish general personal jurisdiction must demonstrate that a defendant had "continuous and systematic contacts" with the forum state, *Helicopteros,* 466 U.S. at 415-16, 104 S.Ct. 1868, mandates a showing "significantly higher" than that necessary for specific personal jurisdiction. *See ESAB Group Inc. v. Centricut Inc.* 126 F.3d 617, 623 (4th Cir.1997).

[1] CEM first contends that Personal Chemistry's "contract with CEM," i.e. the agreement-in-principle that emerged out of the settlement negotiations, in and of itself "subject[s] [Personal Chemistry] to specific personal jurisdiction in North Carolina." Brief of Appellant at 16. CEM argues that Personal Chemistry's provisional acceptance of the agreement-in-principle and subsequent asserted breach of and disregard for that agreement, which form the basis of the present action, subject it to specific personal jurisdiction in North Carolina. Assuming, arguendo, that the agreement-in-principle constitutes a binding contract (a point that Personal Chemistry has consistently refused to concede), the Supreme Court has nonetheless expressly considered and rejected such an argument, explaining that "[i]f the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis in original).

CEM fares no better with its argument that the district court could exercise specific personal jurisdiction over Personal Chemistry because, in the agreement-in-principle, Personal Chemistry assertedly undertook "continuing obligations for the life of the patents." Brief of Appellant at 24. This argument is premised on the licensing agreements for two European patents that constituted part of the agreement-in-principle. As the district court noted, however, these licensing agreements required an up-front, lump-sum payment of royalties rather than continuing or periodic royalty payments. Thus, under the licensing agreements, Personal Chemistry had no "continuing duty to pay royalties or to offer an accounting of products sold incident to a royalty calculation." Accordingly, the licensing agreements (like the agreement-in-principle itself) had no ongoing connection to North Carolina.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.)))**

[2] Nor can CEM prevail on its contention that Personal Chemistry purposefully directed other activities toward North Carolina in a way sufficient to establish specific personal jurisdiction. CEM maintains that such "purposefully directed" activities include (1) Personal Chemistry's actions in negotiating, provisionally agreeing to, and then reneging on the agreement-in-principle; (2) Personal Chemistry's sales of its product to another company in North Carolina; (3) a seminar given in North Carolina; (4) advertisements on its website combichem.net; (5) participation in trade shows directed, in part, at North Carolina companies; and (6) full page advertisements in various national trade publications.

**\*\*3** All of these activities, except for the first group, have nothing to do with the dispute at issue in this case and thus are irrelevant in any consideration of *specific* personal jurisdiction. Nevertheless, CEM maintains that because these contacts involve technology and products that are based in part on the patents at issue in the licensing **\*625** agreements, which in turn constituted part of the agreement-in-principle, these additional contacts somehow provide a basis for specific personal jurisdiction. This argument fails. The dispute in this case is not a patent infringement action, but an action for breach of an agreement-in-principle to settle a patent infringement action (and alleged misrepresentations involving settlement discussions). Thus, it is the contacts surrounding the proposed settlement and agreement-in-principle, not contacts involving the sale or advertising of a product, which may be tangentially related to one of the patents at issue in the Swedish patent infringement action, that must be the basis for specific personal jurisdiction in this case. See *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277-78 (7th Cir.1997) (stating that additional unrelated contacts cannot be aggregated for purposes of specific personal jurisdiction and holding that in breach of contract cases only the dealings between the parties with respect to the contract are relevant to minimum contacts analysis); *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass*

*Prods. Co.,* 75 F.3d 147, 153 (3d Cir.1996) (holding that in a breach of contract case it is only the "dealings *between the parties in regard to the disputed contract* " that are relevant to minimum contacts analysis (emphasis in original)); *Barone v. Rich Brothers Interstate Display Fireworks Co.,* 25 F.3d 610, 615, n. 5 (8th Cir.1994) (finding that additional unrelated contact was irrelevant to question of specific personal jurisdiction).

[3] As to Personal Chemistry's actions surrounding the agreement-in-principle, they do involve the dispute at issue here and so arguably could provide a basis for specific personal jurisdiction. However, none of these activities indicate that Personal Chemistry "purposefully avail[ed]" itself of the "benefits and protections" of the laws of North Carolina sufficient to establish personal jurisdiction over it. See *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Personal Chemistry merely sent its representatives on a single visit to North Carolina for the sole purpose of discussing settlement of a patent infringement action filed against it in Sweden, involving a European patent, and alleged infringing conduct occurring in Sweden. After this single meeting, Personal Chemistry's outside counsel had a few telephone conversations with CEM representatives regarding settlement and, by facsimile, sent them drafts of the agreement-in-principle and informed them that Personal Chemistry's Board ultimately rejected its terms.

Taken together, these contacts do not constitute purposeful acts directed by Personal Chemistry to the State of North Carolina sufficient to establish personal jurisdiction over Personal Chemistry in North Carolina. One visit to the state, accompanied by a few telephone calls and faxes to settle litigation initiated against it in Sweden, would not put Personal Chemistry on notice that it "should reasonably anticipate being haled into court" in North Carolina. See *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Indeed, the *only* reason Per-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.)))**

sonal Chemistry initiated any of these contacts with North Carolina was to attempt to settle a suit filed against it by a North Carolina corporation in Sweden. It would be very odd to permit a plaintiff to obtain personal jurisdiction over a defendant on the basis of the defendant's attempts to settle litigation begun by the plaintiff on the defendant's home turf, presumably because the plaintiff could not obtain personal jurisdiction **\*626** over the defendant on the plaintiff's own turf in the original action.[FN2]
In any event, these contacts clearly do not provide a basis for asserting personal jurisdiction over Personal Chemistry in North Carolina. *Compare Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 451-52 (4th Cir.2000) (refusing to extend personal jurisdiction in Virginia over foreign defendant, even though defendant contracted with Virginia corporation after telephone calls, letters and faxes to Virginia, because "bulk of services" not performed in Virginia); *Ellicott Mach. Corp. v. John Holland Party Ltd.,* 995 F.2d 474, 478-79 (4th Cir.1993) (finding contacts with Maryland "insubstantial," although contract made in Maryland, after purposeful initiation by the foreign defendant and several weeks of negotiations involving letters, faxes, and telephone calls to Maryland).

> FN2. We note that even if CEM had made a sufficient showing to support specific personal jurisdiction, exercise of such jurisdiction over Personal Chemistry would likely offend traditional notions of fair play and substantial justice. *See Asahi Metal Industry Co. Ltd. v. Superior Court of California,* 480 U.S. 102, 115-16, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Such concerns take on heightened importance when, as here, the issue involves an exercise of personal jurisdiction over non-U.S. corporations. *See id.* at 114, 107 S.Ct. 1026 ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of

stretching the long arm of personal jurisdiction over national borders.").

**\*\*4** For all of these reasons, the judgment of the district court is

*AFFIRMED.*

C.A.4 (N.C.),2003.
CEM Corp. v. Personal Chemistry, AB
55 Fed.Appx. 621, 2003 WL 122510 (C.A.4 (N.C.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.


11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.)))**

**C**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)

United States Court of Appeals,
Fourth Circuit.
LE BLEU CORPORATION, Plaintiff-Appellant,
v.
STANDARD CAPITAL GROUP, INCORPOR-
ATED, Defendant-Appellee.
**No. 00-2392.**

Argued April 6, 2001.
Decided June 15, 2001.

Suit was filed alleging breach of contract, fraud, and unfair and deceptive business practices, based on defendant's refusal to refund a retainer to provide financial advice. Following removal, the United States District Court for the Middle District of North Carolina, William L. Osteen, J. dismissed for lack of personal jurisdiction, and plaintiff appealed. The Court of Appeals held that defendant, a California corporation, was not subject to specific personal jurisdiction in North Carolina, consistent with due process.

Affirmed.

West Headnotes

**[1] Constitutional Law 92 €⟶3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-Residents in General.
Most Cited Cases

(Formerly 92k305(5))

**Federal Courts 170B €⟶76.10**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.10 k. Defendant's Activities in Forum State; Cause of Action Arising Therefrom. Most Cited Cases
In specific personal jurisdiction cases, a relationship among the defendant, the forum, and the litigation is the essential foundation, while the constitutional touchstone, under the due process clause, remains whether the defendant purposefully established minimum contacts with the forum State. U.S.C.A. Const.Amend. 14.

**[2] Constitutional Law 92 €⟶3964**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(E) Civil Actions and Proceedings
            92k3961 Jurisdiction and Venue
                92k3964 k. Non-Residents in General.
Most Cited Cases

(Formerly 92k305(5))

**Federal Courts 170B €⟶76.30**

170B Federal Courts
    170BII Venue
        170BII(A) In General
            170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
                170Bk76.30 k. Contract Cases. Most Cited Cases
A contract with a resident of a forum state does not automatically constitute sufficient contacts to support the forum's assertion of specific personal jurisdiction, even where the dispute arises from the contract; rather, for purposes of due process analysis, the contract must have a substantial connection

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.)))**

with the state, so that the quality and nature of a defendant's relationship to the forum can in no sense be viewed as random, fortuitous, or attenuated. U.S.C.A. Const.Amend. 14.

**[3] Constitutional Law 92 3965(5)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(E) Civil Actions and Proceedings
         92k3961 Jurisdiction and Venue
            92k3965 Particular Parties or Circumstances
               92k3965(5) k. Services and Service Providers. Most Cited Cases
   (Formerly 92k305(6))

**Federal Courts 170B 79**

170B Federal Courts
   170BII Venue
      170BII(A) In General
         170Bk77 Corporations, Actions by or Against
         170Bk79 k. Corporate Activities and Contacts Within District; Doing Business in General. Most Cited Cases
California corporation was not subject to specific personal jurisdiction in North Carolina, consistent with due process, in suit by North Carolina corporation for recovery of a retainer paid for California corporation to act as North Carolina corporations' financial advisor in connection with either the private placement of debt or the arrangement of a strategic partnership and related financing, though the parties exchanged some mail and telephone calls, two visits were made to North Carolina by California corporation's employees, a payment was mailed from North Carolina, and the contract was signed in North Carolina. U.S.C.A. Const.Amend. 14.

**\*378** Appeal from the United States District Court for the Middle District of North Carolina, at Durham. William L. Osteen, District Judge. (CA-99-246-1).Linda L. Helms, Wilson & Iseman,

L.L.P., Winston-Salem, NC, for appellant. Martin Nesbitt Erwin, Smith, Helms, Mulliss & Moore, L.L.P., Greensboro, NC, for appellee.

ON BRIEF: G. Gray Wilson, Urs R. Gsteiger, Wilson & Iseman, L.L.P., Winston-Salem, NC, for appellant.

Before LUTTIG and GREGORY, Circuit Judges, and SMITH, United States District Judge, for the Eastern District of Virginia, sitting by designation.

OPINION

PER CURIAM.

**\*\*1** Plaintiff-appellant Le Bleu Corporation appeals the district court's order granting defendant-appellee Standard Capital Group, Inc.'s motion to dismiss for lack of personal jurisdiction. We affirm on the reasoning of the district court.

I.

In February 1999, Robert Wilson ("Wilson"), an independent venture capital consultant, contacted Standard Capital Group, Inc. ("Standard"), a California corporation, regarding a $20 million capital contribution sought by Le Bleu Corporation ("Le Bleu"), a North Carolina corporation engaged in the business of bottling water for retail distribution. Wilson submitted Le Bleu's financial records to Standard for review and traveled to California to meet with Standard. Subsequently, Standard sent two of its employees to North Carolina to meet with Wilson and Jerry Smith, Le Bleu's president, and to view Le Bleu's operations.

Thereafter, on April 28, 1999, Standard mailed a signed agreement (the "Agreement") to Le Bleu. The Agreement provided that Standard would serve as Le Bleu's financial advisor in connection with either the private placement of debt or the arrangement of a strategic partnership and related finan-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.)))**

cing.

In exchange, Le Bleu agreed to provide Standard a non-refundable retainer fee of $100,000 and also agreed to pay Standard, upon private placement of any debt, a percentage of the proceeds raised, and to issue to Standard an unspecified number of options to purchase common stock in Le **\*379** Bleu. J.A. 14. The Agreement did not specify where Standard would perform the work related to the transaction.

Le Bleu signed the agreement in North Carolina and mailed it to Standard in California on May 3, 1999. The contemplated term of the Agreement was only three months, since either party could terminate the Agreement "at any time after July 31, 1999," with or without cause. J.A. 15.[FN1]

> FN1. The "Governing Law" clause provided that the agreement "shall be governed and construed in accordance with the laws of the State of California." J.A. 17.

Subsequently, Le Bleu sent Standard a $100,000 retainer, and Standard began work in California on a memorandum related to the transaction. Although Standard took a draft memorandum to North Carolina for Le Bleu's review, the memorandum was completed in California and none of the fourteen potential investors to whom the memorandum was sent were located in North Carolina. Four investors, all located in Los Angeles, California, responded, and arrangements were made for a joint team of Standard and Le Bleu employees to make presentations to these investors in Los Angeles. Before the presentations could take place, however, Le Bleu sent Standard new financial figures which, according to Standard, reflected a net change in Le Bleu's financial position of negative $2.571 million. Thereafter, Standard canceled the meetings in California, and Le Bleu requested that Standard return the $100,000 retainer. When Standard declined to return the non-refundable retainer, Le Bleu filed suit in the Superior Court of Forsyth County, North Carolina, alleging breach of contract, fraud, and un-

fair and deceptive business practices in violation of N.C.G.S. § 75-1.1. Standard removed the case to federal district court in North Carolina on the basis of diversity of citizenship, *see* 28 U.S.C. § 1332(a), and moved to dismiss the case, pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction. The district court referred the motion to a magistrate judge, who recommended dismissing the case for lack of personal jurisdiction over Standard. After considering Le Bleu's objections to the magistrate judge's report and recommendation, the district court adopted the report and dismissed the case without prejudice. This appeal followed.

II.

**\*\*2** A federal court may exercise personal jurisdiction over nonresident individuals and corporations in a manner prescribed by state law, so long as the application of the state's long-arm statute comports with the Due Process Clause of the Fourteenth Amendment. *See Stover v. O'Connell Assoc., Inc., 84 F.3d 132, 136 (4th Cir.1996).*

Standard concedes that it is subject to North Carolina's long-arm statute, N.C.G.S. § 1-75.4(5)(c), which has been interpreted to extend to the outer limits allowed by the Due Process Clause. *See Hiwassee Stables, Inc. v. Cunningham, 135 N.C.App. 24, 519 S.E.2d 317 (N.C.1999).* Thus, the scope of our inquiry is limited to whether North Carolina may, consistent with due process, exercise personal jurisdiction over Standard.

Le Bleu has never claimed that Standard's contacts with North Carolina are sufficiently continuous and systematic to subject Standard to *general* personal jurisdiction in North Carolina. *See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)* (explaining that general jurisdiction is an exercise of personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum). Rather, the issue is one of specific jurisdiction.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.)))**

[1][2] In specific jurisdiction cases, "a 'relationship among the defendant, the forum,**\*380** and the litigation' is the essential foundation," *Helicopteros,* 466 U.S. at 414 (citing *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)), while the "constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' with the forum State." *Burger King v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A contract with a resident of a forum state does *not* automatically constitute sufficient contacts to support the forum's assertion of specific jurisdiction, even where the dispute arises from the contract. *See Burger King,* 471 U.S. at 478. Rather, for purposes of the due process analysis, the *contract* must have a "substantial connection with the State," so that the "quality and nature" of a defendant's relationship to the forum "can in no sense be viewed as 'random,' 'fortuitous,' or 'attenuated.' " *Burger King,* 471 U.S. at 479-480 (citations omitted).

[3] Le Bleu claims on appeal that the district court erred in adopting the recommendation of the magistrate judge. According to Le Bleu, "that the parties exchanged 'some mail and telephone calls,' that two visits were made to North Carolina by defendant's employees, [and] that a payment was mailed from North Carolina and that the contract was signed in North Carolina" were "facts sufficient to support a finding of personal jurisdiction." Appellant's Br. at 13.

The magistrate judge considered factors that elucidate the "prior negotiation and contemplated future consequences, along with the terms of the contract and the parties' course of dealing," *Burger King,* 471 U.S. at 479, and concluded that Le Bleu had shown only a "negligible connection with North Carolina," and thus had failed to make a prima facie showing that specific jurisdiction over Standard was proper in North Carolina. *See Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989) (holding

that once the jurisdictional issue is properly raised by an out-of-state defendant at a preliminary stage of the case, as here, the plaintiff need only make a prima facie showing of personal jurisdiction).

**\*\*3** The magistrate judge declined to aggregate Standard's other alleged contacts with North Carolina-contracts alluded to in Wilson's affidavit and not part of the contract between Standard and Le Bleu-for purposes of determining whether *specific jurisdiction* lay in North Carolina, noting that such inquiry would be relevant only to an inquiry into *general* jurisdiction, which Le Bleu had not claimed.FN2 J.A. 223 n. 3. *See also RAR, Inc. v.. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277-78 (7th Cir.1997) (noting that even prior contracts between parties to the suit are not to be considered in a specific jurisdiction analysis).

> FN2. Nor is the status of Wilson relevant to whether Standard was subject to personal jurisdiction in North Carolina. For, while Le Bleu referred to Wilson as "defendant's agent," or, "at a minimum a dual agent" in its brief and at argument, Le Bleu failed to adduce evidence from which the legal conclusion that Wilson was Standard's agent can be inferred. Nor did the magistrate judge make any such finding. Indeed, Le Bleu itself earlier characterized Wilson as "a self-employed investment consultant working in Charlotte, North Carolina." Dist.Ct.Rec. Vol. I, Tab 16 at 3.

Consequently, the magistrate judge's report recommended that Standard's motion to dismiss for lack of personal jurisdiction be granted. And after considering Le Bleu's objections and conducting a de novo review, the district court adopted the magistrate judge's report and dismissed Le Bleu's action without prejudice. J.A. 231.

**\*381** Upon review of the parties' briefs and the applicable law, and having had the benefit of oral argument, we conclude that the district court cor-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.)))**

rectly decided the issue before it. Accordingly, we affirm on the reasoning of the district court, as embodied in the magistrate judge's report and recommendation.

*AFFIRMED.*

C.A.4 (N.C.),2001.
Le Bleu Corp. v. Standard Capital Group, Inc.
11 Fed.Appx. 377, 2001 WL 672066 (C.A.4 (N.C.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.