

LEXSEE

ARSHAD PERVEZ, DURDANA PERVEZ, and A.P. ENTERPRISES v. UNITED STATES OF AMERICA and CARPENTER TECHNOLOGY CORPORATION, et al.

Civil Action No. 90-2336

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1991 U.S. Dist. LEXIS 4647

April 5, 1991, Filed
April 9, 1991, Filed

**COUNSEL:** [*1] STANLEY WEINBERG, PHILADELPHIA, PENNSYLVANIA, WILLIAM C. WALLER, JR., ESQ., DENVER, COLORADO, MARGARET M. MC CLELLAN, VINTON, WALLER, SLIVKA & PANASCI, DENVER, COLORADO, FOR PLAINTIFFS.

JAMES G. SHEEHAN, UNITED STATES ATTORNEY'S OFFICE, PHILADELPHIA, PENNSYLVANIA MARIANNE FINNERTY, ANDREW W. MC CARTHY, U.S. DEPARTMENT OF JUSTICE, TORTS BRANCH, CIVIL DIVISION, WASHINGTON, D.C., JEFFREY G. WEIL, DECHERT, PRICE & RHOADS, PHILADELPHIA, PENNSYLVANIA, FOR DEFENDANTS.

**JUDGES:** Edward N. Cahn, J. United States District Judge.

**OPINION BY:** CAHN

**OPINION**

*MEMORANDUM*

The plaintiffs, Arshad Pervez, his wife Durdana Pervez, and A.P. Enterprises, a Canadian company owned by Arshad Pervez, seek compensatory and punitive damages against the United States, Carpenter Technology Corporation, a Pennsylvania corporation, and its subsidiary Carpenter Technology, Ltd., a Canadian corporation. [1] The claims against the United States are brought under the Federal Tort Claims Act ("FTCA"), *28 U.S.C. § 1346(b)*, for intentional interference with prospective economic advantage, false imprisonment, malicious prosecution, false arrest, negligence, intentional infliction of emotional distress, loss of consortium, and exemplary damages, and [*2] under *42 U.S.C. § 1981* for prosecuting Pervez because of his religion and national origin. The claims against Carpenter Technology include intentional interference with existing contractual relations, intentional interference with prospective economic advantage, breach of contract, intentional infliction of emotional distress, and loss of consortium.

> 1   I shall refer to both Carpenter Technology Corporation and Carpenter Technology Ltd. as Carpenter Technology.

The defendant United States has filed a Notice of Substitution, a Motion to Dismiss or in the Alternative for Summary Judgment, and a Renewed Motion for Stay of Discovery. I shall approve the Notice of Substitution



and grant the motions for summary judgment and stay of discovery.

I. *BACKGROUND*

This case arose out of the investigation, arrest, and prosecution of Arshad Pervez, a Canadian citizen and native of Pakistan, for various crimes associated with his attempt to export maraging steel and beryllium to Pakistan. [2] The investigation of Pervez began in [*3] October 1986 when Pervez, who earlier that year incorporated his own import-export business, A.P. Enterprises, contacted Joseph Del Guidice and Albert Tomley of Carpenter Technology, a manufacturer of maraging steel, in an effort to locate a source of maraging steel. Pervez stated that the steel would be shipped to Pakistan and remelted.

> 2  Maraging steel, because of its high tensile strength, is used in the nuclear industry in gas centrifuge enrichment plants. Beryllium is a rare and highly controlled metal which can be used to sheath nuclear reactors. Because both maraging steel and beryllium have nuclear application, their export is regulated by the Export Administration Act, *50 U.S.C. App. § 2410*, and regulations issued pursuant thereto, 15 C.F.R. § 368-99, which require a United States Department of Commerce export license for intended use in an unsafeguarded nuclear facility. *See United States v. Pervez, 871 F.2d 310, 311* (3d Cir), *cert. denied, 109 S. Ct. 3258 (1989)*.

After [*4] receiving Pervez' inquiring, Mr. Tomley contacted the Nuclear Regulatory Commission and met with agents from the United States Customs Service. [3] At the direction of the U.S. Customs Service, Tomley forwarded a price quotation to Pervez. Pervez then arranged to meet with Carpenter representatives to discuss the sale.

> 3  Mr. Tomley contacted the Nuclear Regulatory Commission because of a May 1986 letter sent by the Office of Export Administration. The letter notified Carpenter that agents of the Pakistani government were attempting to acquire maraging steel for use in the development of nuclear weapons. The letter stated that, pursuant to 15 C.F.R. § 378.3, an individual validated export license is required whenever the exporter knows or has reason to know that the commodity being exported will be used to develop nuclear material and that the Pakistani government, as a non-signatory to the Nuclear Non-Proliferation Treaty, would probably be denied an export license. Mr. Tomley's suspicions also were aroused because he did not believe that Pakistan had the facilities required to remelt maraging steel. Memorandum in Support of the United States' Motion to Dismiss or in the Alternative for Summary Judgment at 3-4.

[*5] On November 19, 1986 Mr. Tomley, along with Customs Service Special Agent John New and a representative of Canadian Customs, met with Mr. Pervez in Toronto to discuss his request for maraging steel. Special Agent New, acting undercover, introduced himself as an international marketing analyst for Carpenter Technology. During the meeting Mr. Pervez identified his client as Inam Ul-Haq of Multinational Corporation in Lahore, Pakistan and stated that he wished to purchase approximately two million dollars worth of maraging steel (200,000 pounds) over a two-year period. Tomley told Pervez that Carpenter Technology previously had been directed by the U.S. Department of Commerce not to manufacture maraging steel for use in Pakistan, because it was believed that the material was destined for Pakistan's unsafe nuclear facility. Tomley also told Pervez that Carpenter Technology would not manufacture the steel unless Pervez obtained the proper license from the Commerce Department. *Pervez, 871 F.2d at 312*.

During the course of negotiations with New, Pervez offered a variety of contradictory uses for maraging steel. At different times, Pervez stated that the end use would [*6] be the Pakistani equivalent of NASA, a research project sponsored by Karachi University's engineering program, the manufacture of rocket motors, the manufacture of high speed compressors and turbines, and the development of anti-tank weapon systems. *Id.*

In a telephone conversation in December 1986, Pervez and New discussed the Export Administration Act's licensing requirements. New told Pervez that the Department of Commerce would not issue a license unless Pervez obtained a letter from Multinational stating the intended end use of the maraging steel. New informed Pervez that it might be necessary to make a cash payment to the Department of Commerce licensing officer to ensure the issuance of the license. Pervez said that he

would be willing to pay $ 5,000 to obtain the license, but later asked if he could reduce the "kickback" to $ 3,000. *Id.*

New then requested Special Agent Frank Rovello of the U.S. Customs service to meet with Pervez in Philadelphia. Rovello posed as a Department of Commerce Licenses officer. During their meeting on January 13, 1987, Pervez asked Rovello how to get a license to export maraging steel and what information to put on the application. Pervez [*7] told Rovello that he would present backup letters in support of the application. Rovello informed Pervez that the Department of Commerce needed a "letter from the purchaser saying exactly where they're located . . . what they're going to use [the maraging steel] for, where they're [sic] plant is and where can someone from Commerce in Washington or the Embassy in Pakistan do an on site inspection . . . that's what they'll probably require." When Rovello asked Pervez whether his purchasers would "allow somebody to see the process," Pervez responded, "I don't know about that." Pervez then gave Rovello $ 1,000 as a downpayment to secure the export license. *Id.*

The next day Pervez toured the Carpenter Technology plant in Reading, Pennsylvania. After the tour, Tomley, New, and Pervez had dinner together, during which Tomley questioned Pervez on the end use of the maraging steel. Tomley told Pervez that he "had no intention of putting his company in jeopardy," and that he believed that Pervez had misrepresented the end use of the maraging steel in Pakistan. Tomley then told Pervez that he thought the end use was the uranium enrichment plant in Pakistan. According to New, Pervez nodded [*8] his head in the affirmative in response to Tomley's remark. About one month later Pervez mailed Tomley two end use statements from Multinational and the Pakistan Council of Scientific and Industrial Research which claimed that the maraging steel would be used by Pakistan to manufacture high speed compressors, turbines, and special tools and valves. *Id. at 312-13*.

Although the Commerce Department believed that Pakistan was attempting to obtain maraging steel for use in an unsafeguarded uranium enrichment facility and, therefore, would have denied any application for an individual validated license to export such steel to Pakistan, the Commerce Department issued a false export license to Mr. Pervez at the request of the Customs Service and based upon an agreement between the two agencies that no actual shipment of maraging steel to Pakistan would occur. Shortly thereafter New met with Pervez in Toronto to review export documents and finalize the terms of the sale.

At the meeting Pervez told New for the first time that his buyer also wanted beryllium, a highly controlled specialty metal that also requires a validated export license from the Department of Commerce. [*9] When told that the export of beryllium was also restricted, Pervez suggested that Rovello be contacted again. New and Pervez then discussed alternative methods to export the beryllium from the United States, including diverting it through other countries, identifying the shipment as something other than beryllium, or shipping it directly. When New expressed concern that shipping beryllium was illegal, Pervez remarked that "the United States won't mind a small piece." Pervez also stated that his customers in Pakistan were looking for other hard metals. New replied that he thought the other hard metals would be used in "another application in the plant at Kahuta," to which Pervez responded, "Could be." *Id. at 313*.

On June 18, 1987 Pervez and New spoke over the telephone about the beryllium. New again told Pervez that beryllium was a restricted material requiring an export license and that it had a nuclear application. When Pervez inquired whether it could be shipped under another label, New stated, "You tell me what you want me to put on the box." Pervez then said that he wanted New to commingle the beryllium with the maraging steel for shipment to Pakistan. *Id.*

[*10] On July 10, 1987 Arshad Pervez was arrested after driving to Philadelphia to facilitate the first shipment of maraging steel and to make another payment to Rovello. On July 28, 1987 a grand jury returned an eight count indictment charging him with conspiracy to defraud the government (*18 U.S.C. § 371*), bribery (*18 U.S.C. § 201*), travel in aid of racketeering (*18 U.S.C. § 1952*), submitting false statements to the Department of Commerce (*18 U.S.C. § 1001*), and violating the Export Administration Act (*50 U.S.C. App. § 2410*).

A jury found Mr. Pervez guilty of conspiring to defraud the government (Count One), submitting false statements (Counts Six, Seven, and Eight), and attempting to export beryllium (Count Five). He admitted the elements of the charges in Count Five, claiming entrapment, and was found guilty of the offense. He also admitted the elements of the bribery counts (Counts Two,

Three, and Four), claiming entrapment, but he was found not guilty. He was sentenced to five years of imprisonment on Count One and began serving his sentence while his appeal was pending. On Counts Five, Six, Seven, and Eight the imposition of sentence was suspended, and he was placed on probation [*11] for five years on each count, to run concurrently. *Id. at 313-14*.

On appeal the Third Circuit Court of Appeals vacated the conviction and sentence, remanding for a new trial on Counts One and Five of the indictment. The Court of Appeals found sufficient evidence to support Pervez's convictions on Counts Six, Seven, and Eight (submitting false statements), but they found that in light of the new rule on entrapment pronounced in *Matthews v. United States, 108 S. Ct. 883 (1988)*, [4] the case would have to be remanded on those Counts for a hearing at which Mr. Pervez could offer evidence of entrapment. *Pervez, 871 F.2d at 318-19*.

> 4  In *Matthews* the Supreme Court eliminated the requirement that a defendant admit all elements of a crime before he can raise an entrapment defense. Because Pervez admitted the elements of Count Five and claimed entrapment, the Court of Appeals held that he was entitled to a new trial. However, the Court of Appeals did not find that Pervez had been entrapped as a matter of law.

[*12] After this hearing the District Court found that evidence of entrapment might have affected the verdict on Counts Six through Eight and granted Pervez a new trial on those counts as well as Counts One and Five. A superseding indictment was issued, and Mr. Pervez pleaded nolo contendere to attempting to illegally export beryllium.

II. *DISCUSSION*

A. Jurisdiction

*Section 1346(b)* of the FTCA grants exclusive jurisdiction to the district courts in civil actions for claims against the United States for injuries "caused by the negligence or wrongful acts or omissions of any employee of the government while acting within the scope of his office or employment."

B. Notice of Substitution

The first issue that needs resolution in this case is the Government's request that the United States be substituted as the sole defendant. The United States filed a Notice of Substitution under *28 U.S.C. § 2679* in which the Attorney General certified that Carpenter Technology was acting as an employee of the United States as defined in *28 U.S.C. § 2671*. The plaintiffs oppose the substitution on the ground that the United States had not adequately supported its determination that Carpenter Technology [*13] was acting within the scope of its employment as a federal employee. To support their opposition the plaintiffs claim that Carpenter's employees did not act at all times under the control and direction of the United States and, therefore, Carpenter's relationship to the United States was more akin to that of a general contractor than that of an employee. The United States argues that because the Carpenter employees were at all times under the control and direction of the Government agents in their dealings with Pervez, they are employees within the meaning of the FTCA.

*Section 2671* defines federal employees as "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." Moreover, a "'federal agency' includes . . . corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." *28 U.S.C. § 2671*.

In the leading case on the contractor exemption from the definition of "Federal agency" in *§ 2671*, *Logue v. United States, 412 U.S. 521 (1973)*, [*14] the Supreme Court stated:

that the 'contractor with United States' language of *§ 2671* adopts the traditional distinction between employees of the principal and employees of an independent contractor with the principal, and . . . the critical factor in making this determination is the authority of the principal to control the detailed physical performance of the contractor.

*412 U.S. at 527-28* (citations omitted). Noting that "the legislative history . . . sheds virtually no light on the congressional purpose in enacting the 'acting on behalf of' language in *§ 2671*," *412 U.S. at 530*, the *Logue* Court found a county jail that contracted with the Federal Bureau of Prisons to detain federal prisoners was not an

employee of the Federal Government. Rather, the Court found the jail to be an independent contractor of the Government, because the United States did not have authority under its contract with the jail to physically supervise the conduct of the jail's employees. Instead, the Government's authority was limited to supervision of the jail to guarantee its compliance with federal prison standards relating to conditions and the treatment of prisoners. [*15] *412 U.S. at 529-30.*

Thus, in determining whether an agent is an employee or independent contractor the question is whether the detailed daily operations are supervised by the Federal Government. *United States v. Orleans, 425 U.S. 807, 808 (1976).* The fact of broad, supervisory control, or even the potential to exercise detailed control, cannot convert a contractor into an agent, nor can it be the basis for imposing vicarious liability on the United States. *Gibson v. United States, 567 F.2d 1237 (3d Cir. 1977).* The Government is not liable simply because it retains sufficient control of the manner in which the work is to be performed. *567 F.2d at 1242-43.*

The plaintiffs claim that Carpenter Technology employees had numerous and regular contacts with Mr. Pervez outside the presence of, and beyond the control of, the Government. In particular, the plaintiffs allege that Mr. Tomley forwarded a price quotation to Mr. Pervez and arranged a meeting in Toronto at which Tomley advised Pervez that Carpenter could not manufacture the steel unless the proper license was obtained. Moreover, the plaintiffs allege that, subsequent [*16] to the initial contacts and meeting, Pervez had numerous additional contacts with Tomley, his assistant Larry Taylor, and Joseph Del Guidice. Moreover, the plaintiffs note that subsequent to the January 1987 meeting, Mr. Pervez mailed Tomley certificates regarding the end use of the maraging steel and continued to have regular contact with Tomley, Taylor, and Del Guidice, sometimes outside the presence of Government agents. Finally, the plaintiffs allege that Pervez travel led to Philadelphia in July 1987 at the request of Tomley and Taylor in order to accept the first shipment of steel and beryllium. *See* Response in Opposition to Notice of Substitution at 3.

The actions cited by the plaintiffs, however, were all conducted under orders from and the direct supervision of Special Agent New. Mr. Tomley forwarded a price quotation for maraging steel to Mr. Pervez in accordance with explicit directions from Agent New. Affidavit of Albert Joseph Tomley at 4. Throughout the investigation Agent New had daily contact with Carpenter employees involved in the operation, and all Carpenter employees immediately contacted Agent New and/or Agent Rovello after any communications with Pervez. [*17] Affidavit of John New at 5; Affidavit of Lawrence P. Taylor at 2. Mr. Taylor and Mr. Tomley also made daily notes of any contacts they made with Mr. Pervez. Affidavit of Lawrence P. Taylor at 9; Affidavit of Albert Joseph Tomley at 7. Therefore, even though contacts between Carpenter employees and Mr. Pervez occurred outside the presence of Government agents, those contacts were still under the daily supervision, direction, and control of the United States. *See* Affidavit of Lawrence P. Taylor at 3-9; Affidavit of Albert Joseph Tomley at 3-7. Accordingly, Carpenter Technology, for the purposes of § 2671, was acting as an employee of the United States Government in its dealings with Mr. Pervez, and the United States may substitute itself as the sole defendant in this case.

C. Stay of Discovery

The next issue I address is the Government's Renewed Motion for a Stay of Discovery pursuant to *Fed. R. Civ. Pro. 26(c).* On September 14, 1990 I denied a Government motion for a protective order from further discovery without prejudice in order to allow the plaintiffs more time to conduct discovery. I will now grant the Government's motion to stay discovery even though the plaintiffs still [*18] claim that they need more discovery to defend against the Government's motion to dismiss or in the alternative or summary judgment.

The plaintiffs possess a substantial body of information available regarding the facts surrounding the investigation, arrest, and prosecution of Mr. Pervez. The parties have been through a jury trial, an appeal, and a subsequent hearing. In the process a voluminous record has been compiled that exhaustively details all the facts at issue in this case. The Government has given the plaintiffs all non-privileged material and has assured the court that any remaining material which could be considered relevant is privileged on national security grounds. Memorandum in Support of the United States' Renewed Motion for Stay of Discovery at 2. The plaintiffs have the sworn trial statements of all of the witnesses involved in this case, including Carpenter Technology's employees and the federal agents. The plaintiffs have had ample opportunity in the criminal trial

to cross-examine these witnesses, attack their credibility, and question the validity and authenticity of the evidence. Therefore, the criminal trial record, appeal, and material given by the Government [*19] subsequent to my September 14 Order provide all the relevant facts needed by the plaintiffs to present their opposition to summary judgment on this issue. Finally, the plaintiffs' argument that staying discovery would jeopardize their preparation for trial lacks force, because I have decided to grant summary judgment in favor of the defendant.

D. Motion to Dismiss or for Summary Judgment

1. Scope of review.

Because I have considered evidence in the form of affidavits from both parties, I will treat the United States' Motion to Dismiss or in the Alternative for Summary Judgment as one for summary judgment. Summary judgment is appropriate if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Small v. Seldows Stationery, 617 F.2d 992, 994* (3d cir. 1980). The court does not resolve questions of disputed fact, but merely decides whether there is a genuine issue of fact which must be resolved at trial. *Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249 (1986)*. The facts must be viewed in the light most favorable to the opposing party, and reasonable doubt as to the existence of a genuine [*20] issue of material fact is to be resolved against the moving party. *Continental Insurance Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982)*. However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (citations omitted). The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id. at 252*.

2. The discretionary function exception.

The Government argues that this court does not have subject matter jurisdiction over this matter, because the United States has not waived its sovereign immunity with regard to the plaintiffs' claims. In particular, the Government argues that the separation of powers doctrine bars the plaintiffs' *§ 1981* claims, the discretionary function exception of *§ 2680(a)* of the FTCA bars all tort claims, and *§ 2680(h)* of the FTCA bars all contractual or misrepresentation [*21] claims. The plaintiffs counter that because their case covers actions by law enforcement officers leading to the arrest of Arshad Pervez, their claims are outside the discretionary function exception of *§ 2680(a)* and within the law enforcement proviso of *§ 2680(h)*.

The FTCA waives the sovereign immunity of the United States from suit for:

Injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*28 U.S.C. § 1346(b)*. However, *§ 2680(a)* of the FTCA bars suits against the United States based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Thus, "if governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States abused its discretion or acted negligently." [*22] *U.S. Fidelity & Guar. Co. v. U.S., 837 F.2d 116, 120 (3d Cir. 1988)*.

In *Dalehite v. United States, 346 U.S. 15, 36 (1953)*, the Supreme Court held that "where there is room for policy judgment and decision there is discretion" and *§ 2680(a)* applies. In *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813 (1984)*, the Court reaffirmed *Dalehite,* explaining:

it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. . . . Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee-whatever his or her rank- are of the nature and quality that Congress intended to shield from tort liability.

The *Varig* Court argued that the discretionary function exception is necessary to "prevent judicial 'second-guessing' of legislative and administrative

decisions grounded in social, economic, and political policy through the medium of an action in tort." *467 U.S. at 814*. Most recently, the Supreme [*23] Court reaffirmed both *Dalehite* and *Varig* in *United States v. Gaubert, No. 89-1793, 59 U.S.L.W. 4244, 1991 U.S. LEXIS 1853* (March 26, 1991).

It is irrelevant whether the Government employee actually balanced economic, social, and political concerns in reaching his or her decision. Because "[a] discretionary act is one that involves choice or judgment, . . . discretionary conduct is not confined to the policy or planning level." *United States v. Gaubert, 1991 U.S. LEXIS 1853* at *19. In particular, decisions to investigate or prosecute have been characterized by our Court of Appeals as "an *a fortiori* example of a discretionary function." *Pooler v. United States, 787 F.2d 868, 871* (3d Cir.), *cert. denied, 107 S. Ct. 175 (1986)*.

In *Pooler* a former employee of the Veterans Administration ("VA") and another person brought actions against the United States under the FTCA, alleging that they were falsely arrested as a result of an investigation of charges of marijuana sales on the premises of a VA hospital. *787 F.2d at 869*. The Court of Appeals held that the [*24] decision of a police officer, hired by the VA to conduct the investigation, to use an informant and the extent of control over the informant were discretionary functions immune from liability under the FTCA. The court also held that the officer's decision to file complaints with state authorities was covered by the discretionary function exception. *787 F.2d at 871-72*. *Pooler* went on to note:

. . . if the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, the outcome would be different since federal officials do not possess discretion to commit such violations. But when the sole complaint is addressed, as here, to the quality of the investigation as judged by its outcome, the discretionary function should . . . apply. Congress did not intend to provide for judicial review of the quality of investigative efforts.

*787 F.2d at 871*. The plaintiffs in the case at bar are unable to point to any constitutional provision, federal statute, or regulation which the Government violated. Furthermore, neither the district court in the criminal case nor our Court of Appeals [*25] found any misconduct by the Government.

3. The law enforcement proviso of *§ 2680(h)*.

The plaintiffs attempt to skirt the discretionary function exception in *§ 2680(a)* by characterizing their claims as directed against the U.S. Customs agents who allegedly arrested Pervez without probable cause. The law enforcement proviso to the FTCA waives the immunity of the United States in cases involving

any claim arising out of . . . false arrest, [or] malicious prosecution . . . *Provided*, That with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and *section 1346(b)* of this title shall apply to any claim arising . . . out of . . . false arrest . . . or malicious prosecution.

28 U.S.C. § 2680h) (emphasis in original). *Pooler*, however, held that although *§ 2680(h)* renders the United States liable for false arrests or malicious prosecutions based on the acts of federal law enforcement officers, it is limited to *fourth amendment* violations committed in the course of a search, seizure, or arrest. *787 F.2d 872*. Other than the conclusory allegation that the arresting officers did not [*26] have probable cause to arrest Pervez, the plaintiffs' Amended Complaint does not allege that federal law enforcement officers violated Pervez' rights during his arrest. Thus, *Pooler* immunizes the Government from suit not only on the basis of its investigation and prosecution of Pervez, but also, in the absence of any specific *fourth amendment* violations, on the basis of Pervez' arrest. [5]

> 5   The plaintiffs claim that the arrest of Pervez was both outside the discretionary function exception and a violation of the *fourth amendment*, because it was made without probable cause. Even if the arrest of Pervez was outside the discretionary function and within the purview of the intentional tort proviso, I would still reject the plaintiffs claim, because I find that there is no genuine issue of material fact as to whether or not there was probable cause to arrest Pervez. Pervez pleaded nolo contendere to attempting to export beryllium in violation of the laws; a grand jury found probable cause to indict him; a jury found him guilty of numerous charges; and, finally, our Court of Appeals, even while remanding to take into account recent changes in the law of entrapment, found the jury's

verdict to be supported by a substantial amount of evidence. For Pervez to argue that there was no probable cause for his arrest and then to hinge his entire suit on that arrest is to strain this court's credulity. *See Liberty Lobby, 477 U.S. at 256-57* ("Discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion. Instead the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment").

 [*27] 4. Contractual Claims

Finally, the plaintiffs contract claims are barred. The United States has not waived its sovereign immunity for claims "arising out of . . . interference with contract rights." *28 U.S.C. § 2680(h)*. Moreover, any contract which Mr. Pervez might have entered into to obtain maraging steel or beryllium would have been *void ad initio* because of the Export Administration Act. *See Gramby v. Cobb, 282 Pa. Super. 183, 422 A.2d 889, 892 (1980)*. Nor can the plaintiffs turn their contractual claims into valid misrepresentation claims, because the United States has not waived its sovereign immunity for claims "arising out of . . . libel, slander, misrepresentation, [or] deceit." *28 U.S.C. § 2680(h)*. Therefore, there is no merit to the plaintiffs' claims for misrepresentation and interference with contract.

5. The plaintiffs' *section 1981* claim.

Finally, the plaintiffs' claim of racial, religious, and/or national origin discrimination presents no genuine issue of material fact. Count Six of the plaintiffs' Amended Complaint alleges that

because of Mr. Pervez's race, religion and/or national origin, the United States intentionally and deliberately [*28] and maliciously and/or with a wanton and willful disregard for his rights and feelings prosecuted him as set forth more fully above. As a result of said malicious prosecution, said Defendants interfered with Mr. Pervez's rights afforded under *42 U.S.C. § 1981*.

Plaintiffs' Amended Complaint at paras. 83 and 84. The plaintiffs' *§ 1981* claim is deficient and unsalvageable for several reasons. First, the Amended Complaint fails to plead any specific acts, practices, or policies which resulted in the alleged discrimination against him. *See Sambrick v. Borough of Norristown, 639 F. Supp. 1351, 1354 (E.D. Pa. 1986)*; *German v. Killen, 495 F. Supp. 822, 827 (E.D. Ark. 1980)*. In fact, none of the plaintiffs' briefs, affidavits, or exhibits mentions the *§ 1981* claim or describes any racial, religious, or ethnic discrimination directed against Mr. Pervez.

Second, the Amended Complaint alleges a *§ 1981* claim based on Pervez's prosecution, not his arrest or investigation. In *United States v. Berrigan, 482 F.2d 171, 180 (3d Cir. 1973)*, our Court of Appeals held that the separation of powers doctrine prohibits judicial oversight of the [*29] prosecutorial decisions of the Executive Branch, stating, "'few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.'" (Quoting *Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967)*).

III. *CONCLUSION*

For the foregoing reasons, the United States shall be substituted as the sole defendant in this case, the United States' Renewed Motion for a Stay of Discovery shall be granted, and summary judgment shall be entered in favor of the defendant and against the plaintiff.

An order follows.

*ORDER*

AND NOW, upon consideration of the Defendant United States of America's Notice of Substitution, Motion to Stay Discovery, and Motion to Dismiss or in the Alternative for Summary Judgment, and the Plaintiffs' responses thereto, IT IS ORDERED that:

1. Carpenter Technology Corporation and Carpenter Technology Ltd. are dismissed from this action, and the United States is substituted as the sole Defendant;

2. the United States of America's Motion to Stay Discovery is GRANTED; [*30] and

3. the Defendant United States of America's Motion to Dismiss or in the Alternative for Summary Judgment is GRANTED, and JUDGMENT is hereby ENTERED in favor of the United States and against the Plaintiffs.

IT IS FURTHER ORDERED that the clerk close the within case for statistical purposes.