# ADDENDUM

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Asheville Division.
Daniel H. BRACKETT, Plaintiff,
v.
Connie WALKER; and United States Postal Service, Defendants.
**No. 1:07CV346.**

Nov. 19, 2007.

Daniel Brackett, Spindale, NC, pro se.

Sidney P. Alexander, United States Attorney, Asheville, NC, for Defendants.

**MEMORANDUM AND RECOMMENDATION and ORDER**

DENNIS L. HOWELL, United States Magistrate Judge.

***1 THIS MATTER** is before the court on defendants' Motion to Substitute the United States and to Dismiss Named Defendants. In accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975), the undersigned advised plaintiff, who is proceeding *pro se*, on October 30, 2007, that he carries a heavy burden in responding to a motion to dismiss. The court allowed plaintiff up to November 13, 2007, to respond, and no response has been filed.

In this case, the individual defendant contends that she is not a proper defendant to this action and that the United States of America should be substituted as the correct defendant. In support of this request, the United States Attorney has certified that defendant Connie Walker was at all times acting within the scope of her employment when the alleged tort occurred. Further, the defendants have shown as a matter of law that federal agencies, such as the United States Postal Service, are not amenable to suit in tort. 28 U.S.C. § 2679(a).

Plaintiff was advised that, based upon such showing, the burden now shifts to him to refute this certification and prove to the court by a preponderance of the evidence that Defendant Walker was not acting within the scope of her employment. The court further advised that specific evidence is required and plaintiff cannot rely on conclusory allegations or speculation for failure to state a cause of action.

No showing in rebuttal having been made, the undersigned, the court will recommend that Defendant Walker be dismissed from this action and that the United States of America be substituted for the United States Postal Service as the proper defendant.

Finally, the court has before it defendant's Motion to Stay Initial Attorneys Conference. The undersigned will grant such motion, and stay such requirement until 14 days after the district court disposes of defendants' Motion to Substitute the United States and to Dismiss Named Defendants.

**RECOMMENDATION**

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendants' Motion to Substitute the United States and to Dismiss Named Defendants (# 2) be **ALLOWED,** that defendant Connie Walker be dismissed, and that the United States of America be **SUBSTITUTED** as the proper party defendant for the named defendant United States Postal Service.

**ORDER**

**IT IS ORDERED** that the government's Motion to Stay Initial Attorney's Conference (# 5) is **GRANTED,** and that the requirement of conducting an IAC is **STAYED** and reset to 14 days from the district court's disposition of the defendants' Motion to Substitute the United States and to Dismiss Named Defendants (# 2).

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

parties from raising such objections on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *United States v. Schronce*, 727 F.2d 91 (4th Cir.), *cert. denied*, 467 U.S. 1208 (1984).

W.D.N.C.,2007.
Brackett v. Walker
Not Reported in F.Supp.2d, 2007 WL 4165248 (W.D.N.C.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





For Opinion See 484 F.3d 884

United States Court of Appeals,
Seventh Circuit.
Joseph JASKOLSKI and the National Insurance Crime Bureau, Petitioners-Appellants,
v.
Alberto R. GONZALES, Attorney General of the United States, Joseph Van Bokkelen, United States Attorney for the Northern District of Indiana, and The United States of America, Respondents-Appellees.
No. 06-3508.
January, 2007.

On Appeal from the United States District Court for the Northern District of Indiana

Brief for the Federal Appellees

Peter D. Keisler, Assistant Attorney General, Joseph S. Van Bokkelen, United States Attorney, Barbara L. Herwig, (202) 514-5425, Howard S. Scher, (202) 514-4814, Attorneys, Appellate Staff, Civil Division, Room 7239, Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001.

TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ... 1

STATEMENT OF THE ISSUES ... 2

STATEMENT OF THE CASE ... 2

1. Nature of the Case. ... 2

2. The Westfall Act ... 3

3. The Facts ... 4

4. The Proceedings Below ... 9

SUMMARY OF ARGUMENT ... 10

STANDARD OF REVIEW ... 12

ARGUMENT ... 13

A. The District Court Correctly Held That Jaskolski Was Not An “Employee Of The Government” Within The Meaning Of The FTCA ... 13

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

B. If This Court Reverses The District Court's Ruling, It Should Remand The Case To The District For A "Scope Of Employment" Determination. ... 34

CONCLUSION ... 36

CERTIFICATE OF COMPLIANCE

CERTIFICATE PURSUANT TO CIRCUIT RULE 31 (e)

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

Cases:

*Alinsky v. U.S.*, 415 F.3d 639 (7th Cir. 2005) ... 12, 13

*B&A Marine Co., Inc. v. American Foreign Shipping Co., Inc.*, 23 F.3d 709 (2d Cir. 1994) ... 21

*Beul v. ASSE Int'l, Inc.*, 233 F.3d 441 (7th Cir. 2000) ... 30

*Bird v. United States*, 949 F.2d 1079 (10th Cir. 1991) ... 22

*Bravo v. United States*, 403 F. Supp.2d 1182 (S.D. Fla. 2005) ... 21

*Cannady v. United States*, 155 F. Supp.2d 1379 (M.D. Ga. 2001) ... 17, 20

*Clifford v. United States*, 308 F. Supp. 957 (D.S.D. 1970) ... 23

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) ... 2

*Costa v. United States*, 845 F. Supp. 64 (D. Conn. 1994) ... 19-20, 33

*Dilger v. United States*, 696 F. Supp. 1071 (E.D. Va. 1988) ... 13, 25-26

*Ezekiel v. Michel*, 66 F.3d 894 (7th Cir. 1995) ... 3, 12, 19-20, 33

*Feres v. United States*, 340 U.S. 135 (1950) ... 12

*Ferguson v. United States*, 712 F. Supp. 775 (N.D. Cal. 1989) ... 13, 34-35

*Jaskolski v. Daniels*, 427 F.3d 456 (7th Cir. 2005) ... 29

*Logue v. United States*, 412 U.S. 521 (1973) ... 10, 12, 13, 14, 15, 19, 22, 23, 24,26

*Martarano v. United States*, 231 F. Supp. 805 (D. Nev. 1964) ... 21-22

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Pershing Div. of Donaldson, Lufkin & Jenrette Securities Corp. v. U.S.*, 22 F.3d 741 (7th Cir. 1994) ... 13

*Quilico v. Kaplan*, 749 F.2d 480 (7th Cir. 1984) ... 12, 15

*Sullivan v. U.S.*, 21 F.3d 198 (7th Cir.), *cert. denied*, 513 U.S. 1060 (1994) ... 4, 12

*Taboas v. Mlynczak*, 149 F.3d 576 (7th Cir. 1998) ... 3, 34

*Thompson v. United States*, 504 F. Supp. 1087 (D.S.D. 1980) ... 20-21

*U.S. v. Jarrett*, 133 F.3d 519 (7th Cir.), *cert. denied*, 523 U.S. 1112 (1998) ... 4

*United States v. Becker*, 378 F.2d 319 (9th Cir. 1967) ... 23

*United States v. Orleans*, 425 U.S. 807 (1976) ... 10, 12, 14, 15, 19, 23, 24, 27

*United States v. Pimental*, 380 F.3d 575 (1st Cir. 2004) ... 28

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) ... 13

*United States v. Standard Oil Co.*, 332 U.S. 301 (1947) ... 12

*Warrum v. U.S.*, 427 F.3d 1048 (7th Cir. 2005) ... 13

*Witt v. United States*, 462 F.2d 1261 (2d Cir. 1972) ... 13, 23

Statutes:

5 U.S.C. 3111(c)(1) ... 30

7 U.S.C. 2272(c) ... 30

10 U.S.C. 1588(d) ... 31

10 U.S.C. 2113(j)(4) ... 31

15 U.S.C. 637(b)(1)(C)(i) ... 31

15 U.S.C. 4102(d)(1) ... 31

15 U.S.C. 4105(5) ... 31

16 U.S.C. 18i(b) ... 31

16 U.S.C. 558c(b) ... 31

16 U.S.C. 565a-2 ... 31

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

16 U.S.C. 742f(a)(4) ... 31

16 U.S.C. 4604(c)(2) ... 31

22 U.S.C. 2504(h) ... 31

22 U.S.C. 5422(c)(2)(A) ... 31

25 U.S.C. 2020 ... 31

28 U.S.C. 1291 ... 2

28 U.S.C. 1346(b) ... 12

28 U.S.C. 2107(b) ... 2

28 U.S.C. 2671 ... 2, 3, 9, 14, 29

28 U.S.C. 2679 ... 9, 35

28 U.S.C. 2679(b)(1) ... 3

28 U.S.C. 2679(c) ... 9

28 U.S.C. 2679(d)(1)-(4) ... 4

28 U.S.C. 2679(d)(1) ... 3

28 U.S.C. 2679(d)(3) ... 1, 3, 4, 9

28 U.S.C. 2680(h) ... 35

33 U.S.C. 569c ... 31

42 U.S.C. 3788(g) ... 31

42 U.S.C. 5055(b) ... 32

43 U.S.C. 1737(f) ... 32

Rules:

Federal Rules of Appellate Procedure, Rule 4(a)(1)(B) ... 2

Federal Rules of Criminal Procedure:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Rule 6 ... 27, 28

Rule 6(e) ... 6, 27, 28, 29

Rule 6(e)(3)(E)(I) ... 29

Miscellaneous:

Black's Law Dictionary 5th Ed. at 570 ... 32

Handling Federal Tort Claims, Jason, L.S. and Longstreth, R.C., (1996) § 8.02 ... 12

http://www/nicb.org.public/about/index/cfm ... 4, 5

Restatement (Second) of Agency (1958),

§ 1 ... 26, 29

§ 227 ... 33

**Jurisdictional Statement**

The jurisdictional statement in the appellant's brief is not entirely complete and correct. The district court's jurisdiction was invoked by the Attorney General under 28 U.S.C. 2679(d)(3), by removing to federal court a petition for certification of scope of employment filed in state court by Joseph Jaskolski (Jaskolski) and the National Insurance Crime Bureau (NICB). The district court order appealed from was entered on September 14, 2006. A1. The notice of appeal, which was filed on September 18, 2006 (A23, Docket No. 40), was timely under 28 U.S.C. 2107(b) and Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure. The order is final either because it adjudicates all of the claims with respect to all parties and ends the litigation in district court or because it qualifies for immediate appeal under the collateral order doctrine set forth in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). Therefore, this Court has jurisdiction to review the district court's order pursuant to 28 U.S.C. 1291.

**Statement of the Issues**

1. Whether the district court correctly determined, consistent with the Attorney General's determination, that Jaskolski was not an "employee of the government" within the meaning of the Federal Tort Claims Act (FTCA), 28 U.S.C. 2671, when the events at issue occurred.

2. Whether, if this Court reverses the district court's ruling, a remand is necessary to allow the district court, in the first instance, to determine precisely which claims against Jaskolski fall within his "employee" status and to make a "scope of employment" determination as to those claims.

**Statement of the Case**

**1. Nature of the Case.**

Jaskolski is an employee of the NICB, who, along with federal authorities, participated in an investigation of Rick and Kenneth Daniels. The investigation resulted in an indictment and criminal prosecution of the Daniels based on an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegedly fraudulent insurance claim. Both were acquitted. See A2-3 (district court Opinion and Order dated Sept. 14, 2006).

Following the acquittal, Rick and Anna Daniels filed a state court action for malicious prosecution and other related claims against Jaskolski, NICB, and others. Jaskolski and NICB filed a petition under 28 U.S.C. 2679(d)(3) in the state court action, seeking an order declaring that Jaskolski was an "employee of the government" under 28 U.S.C. 2671 during the grand jury investigation and criminal prosecution of plaintiff, Rick Daniels. The Attorney General removed the action to federal district court pursuant to 28 U.S.C. 2679(d)(3) and subsequently sought a remand to state court on the ground that Jaskolski was not an employee of the government. The district court sustained the Attorney General's determination and issued an order remanding the case to the state court. A2-3, A16.

**2. The Westfall Act.**

The Westfall Act amended the FTCA to extend immunity from liability to federal employees sued for tortious conduct occurring within the scope of their employment. See 28 U.S.C. 2671, 2679(b)(1), (d)(1) & (3); *Taboas v. Mlynczak*, 149 F.3d 576, 579 & n.1 (7th Cir. 1998); *Ezekiel v. Michel*, 66 F.3d 894, 897-98 & n.6 (7th Cir. 1995); *Sullivan v. U.S.*, 21 F.3d 198, 199-200, 201-02 (7th Cir.), *cert. denied*, 513 U.S. 1060 (1994); and *U.S. v. Jarrett*, 133 F.3d 519, 540 (7th Cir.), *cert. denied*, 523 U.S. 1112 (1998). When a tort action is filed against a federal employee in state court, the Attorney General may certify that the employee acted within the scope of his employment with respect to the actions giving rise to the suit and remove the action to federal court. *Id.*; 28 U.S.C. 2679(d)(1)-(4). If the Attorney General's scope certification is not challenged or, if challenged, is upheld, the United States will be substituted for the federal employee as the defendant, and the action will then proceed against the United States under the Federal Tort Claims Act. *Id.* Where the Attorney General does not appear in state court to make such a certification, the employee may file a petition requesting a "scope certification" by the state court. 28 U.S.C. 2679(d)(3). The Attorney General may then remove the petition from state to federal court for resolution. *Id.*

**3. The Facts.**

Joseph Jaskolski was an investigator and salaried employee of the National Insurance Crime Bureau (NICB) during the events at issue here. A2, A217, A263. The NICB is a not-for-profit organization (A210) funded by "approximately 1000 property/casualty insurance companies," NICB Website http:// www/nicb.org.public/about/index/cfm, to investigate and detect instances of insurance fraud. A2. The NICB Website also states that the NICB is comprised of skilled and knowledgeable professionals who "partne[r] with *** law enforcement agencies to facilitate the identification, detection and prosecution of insurance criminals." *Id.* The NICB was formed in 1992 by the merger of the Insurance Crime Prevention Institute (ICPI) (also a non-for-profit organization funded by the insurance industry, see A66-68, A88) and the National Automobile Theft Bureau. A66, A84.

Jaskolski has been an employee of NICB since 1992 and reported to an NICB regional manager. A2, A3, A90, A99, A102, A217, A263.[FN1] At the NICB, Jaskolski conducted classes and seminars, did public speaking, and investigated referrals from insurance companies of suspicious insurance claims. A68-72, A85. With respect to the events at issue in this case, NICB received a request from Liberty Mutual Insurance Company to investigate an insurance claim that had been made by Liberty Mutual's insureds, the Daniels, arising out of an October 23, 1998, motorhome fire. A2-4, A100, A153.

FN1. Prior to employment with the NICB, Jaskolski worked for the ICPI starting in 1986. A67-68, A84.

Jaskolski opened a case file on the request and gathered information for three or four weeks. A4, A159. He was not given direction by his supervisor because, as a senior investigator, he had "the knowledge to run [his] own investigation." A157. Eventually, on April 1, 1999, Jaskolski contacted FBI Agent Tim Campbell (A4, A159, A162-63) and began what Jaskolski characterized as a "joint investigation with the FBI" (A153). Jaskolski met with Campbell to discuss the insurance claim, and at that meeting, Campbell decided to request that the United States Attorney's office

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

open a criminal investigation into the claim. A4, A37 ¶3. Campbell also asked Jaskolski to assist in the investigation. A4, A38 ¶4, A377-78.

Jaskolski assisted in the investigation, was never paid by the FBI (A166), but asserted that he was acting under the supervision of the FBI "as an agent" at least in part because, shortly before the "joint investigation" with the FBI began, he received an order under Rule 6(e), Fed. R. Crim. P., giving him access to grand jury information as "government personnel." A4, A6, A38 ¶5, A167-68. Jaskolski also stated that he had been "an agent [of the FBI] for 16 years" in northwest Indiana because he "testified in numerous federal cases and every three years [was] put on the list for a three-year extension of the 6(e) rule." A168.

With respect to the investigation, Jaskolski stated that he assisted in the following areas:

"a. Accompanied Agent Campbell on interviews of witnesses;

b. Accompanied Agent Campbell on site or other inspections;

c. Assisted in reviewing documents as directed;

d. Assisted in escorting of witnesses at grand jury proceedings;

e. Assisted United States Attorney Clarence Butler at trial."

A6; A38 ¶7.

As to all of these activities, Jaskolski claimed that he "did only what [he] was told to do by either Agent Campbell or AUSA [(Assistant United States Atorney)] Butler, or other FBI agents and U.S. Attorneys." A7-A8, quoting A38 ¶8. In addition, Jaskolski claimed that he acted "under the direct supervision or control of either Agent Campbell or [AUSA] Butler" and that they "always decided what particular result to achieve and they alone decided also to achieve that result in a particular way at a particular location at a particular time with particular documents or persons." A8, quoting A39 ¶9. Jaskolski further stated that he "did not and could not exercise any independent judgment of [his] own with regard to any aspect of the investigation, indictment or prosecution of the Daniels." A7, quoting A39 ¶10. He interviewed only those witnesses that Campbell or Butler told him to interview, "when and where to interview the witnesses," and was always accompanied by Campbell or Butler who, Jaskolski claimed, who were "always physically present and directly supervising or directing [him]." A39 ¶11. See also A7, A194-95.[FN2] Similarly, Campbell or Butler "decided what documents to subpoena or obtain, as well as the inspections to conduct." A7. See also A40 ¶12.

FN2. For example, Jaskolski and Campbell jointly interviewed Rick Daniels (A172) and went to the scene of the fire together (A182). Jaskolski made no notes of his own with respect to any of the interviews; Campbell filled out what are called Form 302's. A201-02

During grand jury proceedings, "while AUSA Butler presented witnesses to the grand jury, [Jaskolski] would assist Agent Campbell in making sure other witnesses appeared and that the witnesses were kept separate." A40 ¶13. Jaskolski was never in the grand jury room. A192.

At the trial, Jaskolski sat at counsel table on occasion, but mostly sat in the audience. A7, A194, A313-15. At the beginning of the trial, he was introduced as a representative of NICB. Id. Jaskolski considered himself a part of the prosecution team (A7, A221), assisting Campbell or Butler "according to their directions" (A40 ¶14) and responding to their requests for documents or other information (A7, A40-41 ¶14). Jaskolski emphasized that he did only what he was told and that he was always directly supervised by either Campbell or Butler. A7-A8, A40-41 ¶¶13, 14. He did not report to anyone at the NICB any information regarding the Daniels investigation or prosecution, and no one at the NICB had any influence over his participation in the investigation and prosecution of the Daniels. A7, A41¶¶16-17.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Jaskolski referred this case to the FBI because of his prior experience with the FBI, and his participation in a white collar task force with the FBI, Blue Cross Blue Shield, the National Guard, and other entities. A204-05. While Jaskolski worked on the Daniels case with the FBI and U.S. Attorney's office, he was also working on other cases assigned to him by his supervisor at NICB. A7-8, A263.

**4. The Proceedings Below.**

Rick and Kenneth Daniels were indicted, tried, and acquitted. Following the acquittal, Rick and Anna Daniels filed a state court action for malicious prosecution and related claims against Jaskolski, NICB, and others. Jaskolski and NICB notified the United States Attorney of the suit under 28 U.S.C. 2679(c) and asked the United States Attorney to certify that Jaskolski was acting within the scope of his employment as an “employee of the government” as defined in 28 U.S.C. 2671 in order that the United States would be substituted as the proper defendant under the Federal Tort Claims Act (FTCA). The United States Attorney did not decide the request for certification of employment, but sent the request to the Department of Justice in Washington. The Associate Attorney General considered the request for certification of employment and declined to issue the Section 2679 certification. A2-3, A7-8.

Jaskolski and NICB then filed a petition under 28 U.S.C. 2679(d)(3) in the state court action, seeking an order declaring that Jaskolski was an “employee of the government” under 28 U.S.C. 2671, acting within the scope of his employment, during the grand jury investigation and criminal prosecution of Rick Daniels. A3. The Attorney General removed the action to federal district court pursuant to 28 U.S.C. 2679(d)(3) and subsequently sought a remand to state court on the ground that Jaskolski was not an “employee of the government” during the events at issue here. A3. The district court sustained the Attorney General's determination and issued an order remanding the case to the state court. *Id.* at A2-A3 & A16.

Jaskolski and NICB then filed the instant appeal.

**Summary of Argument**

1. The question presented in this appeal is whether Jaskolski was an “employee of the government” during the grand jury investigation and trial of the Daniels. If so and if he was acting within the scope of his employment, the Westfall Act amendment to the FTCA requires substitution of the United States as defendant with the action then proceeding against the United States under the FTCA. Under *Logue v. United States*, 412 U.S. 521 (1973), and *United States v. Orleans*, 425 U.S. 807 (1976), the seminal Supreme Court cases, an entity or individual who would otherwise be considered an independent contractor can be an “employee of the government” if the government exercises control over the day-to-day performance of that entity's or individual's work. Under that principle, Jaskolski was not an “employee of the government” during the events at issue. He was not paid by the government, and the government had no authority to compel him to provide the assistance that he gave.

Jaskolski contends that he was an “employee of the government” because all of the assistance he provided to the government with respect to the grand jury investigation and Daniels trial was under the direct supervision and control of the FBI and the U.S. Attorney's office, that he did only what he was asked to do, and that he exercised no independent judgment regarding the assistance. The fact that the government may have supervised and directed Jaskolski to the extent he provided assistance on the Daniels matter does not, however, demonstrate that the government controlled and supervised the day-to-day performance of his work. As to that question, the record establishes that NICB, alone, had that authority. NICB, which was Jaskolski's employer and which paid Jaskolski's salary, had the ability to, and in fact did, assign Jaskolski to work on other matters while it also permitted him to work the Daniels matter. Jaskolski worked on the Daniels matter only because NICB allowed him to do so and only because it suited NICB's interests. His work was purely voluntary, and at any time, NICB could have directed him to work on a different matter. No evidence exists to demonstrate that the government had the authority to compel Jaskolski to work on the Daniels

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

matter or that it could have countermanded an NICB assignment to Jaskolski to work on something other than the Daniels matter.

2. Assuming *arguendo* that the Court reverses the district court's ruling, a remand is necessary to allow the district court to determine which claims in the Daniels' complaint address Jaskolski's conduct as an "employee of the government" for FTCA purposes and whether Jaskolski was acting within the scope of his employment with respect to those claims. The district court has never addressed either question, which both raise an issue of fact that, as a result, should be addressed by the district court in the first instance.

**Standard of Review**

"Whether [an individual] is an 'employee of the government' under the Westfall Act is a question of law that [this Court] review[s] de novo." *Sullivan v. U.S.*, 21 F.3d at 201.[FN3] See also *Ezekiel v. Michel*, 66 F.3d at 899, citing *United States v. Orleans*, 425 U.S. 807, 814 (1976), and *Logue v. United States*, 412 U.S. 521, 528 (1973); and *Quilico v. Kaplan*, 749 F.2d 480, 483 (7th Cir. 1984). Moreover, it is a question of federal law. See *Handling Federal Tort Claims*, Jason, L.S. and Longstreth, R.C., (1996) § 8.02, citing *Feres v. United States*, 340 U.S. 135, 143, 146 (1950), and *United States v. Standard Oil Co.*, 332 U.S. 301, 305-06 n. 11 (1947). To the extent factual findings are considered, they are reviewed under a clearly erroneous standard. See, *e.g.*, *Alinsky v. U.S.*, 415 F.3d 639, 646 (7th Cir. 2005).

FN3. *Sullivan* added that "[t]his is purely a question of statutory interpretation on which neither party bears the burden of proof." 21 F.3d at 201 n.6. See also *Ezekiel v. Michel*, 66 F.3d at 899-900.

In addition, the FTCA which waives the sovereign immunity of the United States only for the acts or omissions of an "employee of the government while acting within the scope of his office or employment," 28 U.S.C. 1346(b) - "provides a limited waiver of the federal government's sovereign immunity." *Alinsky v. U.S.*, 415 F.3d at 643. See also *Warrum v. U.S.*, 427 F.3d 1048 (7th Cir. 2005); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). "Absent explicit language to the contrary, a waiver of sovereign immunity must be narrowly construed." *Pershing Div. of Donaldson, Lufkin & Jenrette Securities Corp. v. U.S.*, 22 F.3d 741, 743 (7th Cir. 1994). Accordingly, the definition of an "employee of the government," which is a central factor in the FTCA's waiver of sovereign immunity, must be read narrowly as well.[FN4]

FN4. Jaskolski cites *Witt v. United States*, 462 F.2d 1261 (2d Cir. 1972), and *Ferguson v. United States*, 712 F. Supp. 775, 781 (N.D. Cal. 1989), for the proposition that the term "employee" was drafted to have expansive effect. Jaskolski Br. at 17. *Witt* preceded *Logue* and "has been essentially overruled" by that decision. *Dilger v. United States*, 696 F. Supp. 1071, 1074 (E.D. Va. 1988). *Ferguson* cited *Witt* for the "expansive effect" proposition, and therefore, has no greater value than *Witt* in this regard.

ARGUMENT

**A. The District Court Correctly Held That Jaskolski Was Not An "Employee Of The Government" Within The Meaning Of The FTCA.**

1. The FTCA, in pertinent part, defines "employee of the government" as follows:

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty ***, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation ***."

28 U.S.C. 2671.

Thus, an "employee of the government" can either be an "office[r] or employe [e] of any federal agency" or a "per-

so[n] acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation ***." There is no contention here that Jaskolski was an officer or employee of a federal agency or an active member of the military forces. See All. The only question presented in this case (*id.*) and, therefore, in this appeal is whether Jaskolski was "[a person] acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States ***." The seminal cases addressing this question are *Logue v. United States*, 412 U.S. 521 (1973), and *United States v. Orleans*, 425 U.S. 807 (1976), and the principles established in those cases demonstrate that Jaskolski was not an "employee of the government" during the events at issue.

The entity under scrutiny in *Logue* was a county jail that contracted with the FBI to house federal prisoners. While the county was required to comply with Bureau of Prisons rules and regulations which specified "standards of treatment for federal prisoners, including methods of discipline, rules for communicating with attorneys, visitation privileges, mail, medical services, and employment," the United States was without "authority to physically supervise the conduct of the jail's employees." *Logue*, 412 U.S. at 530. In *Orleans*, the issue was whether a community action agency that received all of its funding from the federal government and was created exclusively to carry out programs authorized by federal legislation was an agency or instrumentality of the federal government for purposes of the FTCA. Notwithstanding that the entities at issue in both *Logue* and *Orleans* were subject to extensive federal regulation, both were found to be contractors and not agencies, and their employees not federal employees, because the government did not supervise the day-to-day performance of their employees' work. The question "is not whether the [entity] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." *Orleans*, 425 U.S. at 815. See also *Quilico*, 749 F.2d at 482. Accordingly, "whether Jaskolski can be considered a Government employee under the FTCA boils down to whether the Government was authorized to control the day to day performance of Jaskolski's work." A13.

2. a. Jaskolski argues that the government had authority to control the day-to-day performance of his work (Jaskolski Br. at 18-28), but close examination of his argument shows that it is based on his contention that he was under the direct supervision and control of Agent Campbell and AUSA Butler *only* when he was providing assistance as to the grand jury investigation and the Daniels trial. He does not claim that Campbell or Butler compelled, or had the authority to compel, him to provide that assistance or that they had the authority to countermand the NICB had the latter directed Jaskolski not to work on the Daniels matter. Thus, the fact that, *with respect to the scope of his assistance*, he did only what Campbell and Butler asked him to do and exercised no independent judgment regarding that assistance (see pp. 5-8, *supra*, citing A7-8, A37-40), does not equate to government control over the day-to-day performance of his work.

In fact, only NICB had control over the day-to-day performance of Jaskolski's work. Jaskolski was a salaried employee of NICB, which originally assigned him to work the Daniels matter. His investigation began as a result of that assignment and on behalf of the NICB. See A99:

"Q. At some point you were involved in doing an investigation *** that involved Ken and Sharon Daniels; is that right?

A. Correct.

Q. Whatever work you did was that on behalf of the National Insurance Crime Bureau?

A. Correct. ***

Q. And if you were requested to do that, the request would have come from your superior at the NICB?

A. Correct."

See also A102.

In the beginning, Jaskolski determined what information to collect and testified that, as a senior investigator, he was responsible for knowing how to run an investigation. A157. At some point he referred the case to the FBI because of the criminal law implications he uncovered, but he did so on behalf of the NICB and the latter's interest in preventing insurance fraud. And it was on NICB's behalf that Jaskolski agreed to lend assistance to the FBI and U.S. Attorney.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

See, *e.g.*, JA 158-59 ("NICB would [j]oin with the FBI for additional investigation").

Although Jaskolski assisted the government, Jaskolski continued to work for NICB, which continued to pay his salary. See A2-3, A217, A263.[FN5] NICB had the ability to, and in fact did, assign Jaskolski to work on other matters while it permitted him to work the Daniels matter. *Id.*[FN6] It was NICB's ability, to the exclusion of the government, to assign Jaskolski matters in addition to the Daniels matter that demonstrates that NICB, not the government, had control over the day-to-day performance of Jaskolski's work. See A7-8, A14-15, A263.

FN5. Jaskolski argues that the district court erred in considering the salary issue, since an individual can qualify as an "employee of the government" for FTCA purposes regardless of compensation. Jaskolski Br. 31-32. Salary, however, is at least one, even if not a dispositive, factor to be considered in determining employee status, and neither the district court nor the government considered the salary question, alone, to be dispositive. Notably, *Cannady v. United States*, 155 F. Supp.2d 1379 (M.D. Ga. 2001), a case upon which Jaskolski relies (Jaskolski Br. 23), emphasized the relevance of the salary factor. *Id.* at 1382, 1383.

FN6. Jaskolski argues that it is wrong to cite A264-65 for the proposition that he was working on other matters while working on the Daniels matter with the government. Jaskolski Br. at 32 n.5. The argument is a red herring. First, Jaskolski concedes that he did other work for NICB during this time. *Id.*, citing A378 (conceding that he "worked *almost* full time on the Daniels case from April 1, 1999 until the end of the trial") (emphasis added). Second, at A263, in responding to the question whether "[a]t the time that you were working jointly with the F.B.I. and the U.S. Attorney as part of their team *** were [you] working on other files ***," Jaskolski answered "[y]es." At A264-265, Jaskolski was answering a question premised on a distinctly different time frame. Consequently, consistent with A263, the district court found, as a matter of fact, that Jaskolski worked on other NICB matters while he worked on the Daniels case. See A7-8. That finding is not clearly erroneous.

Moreover, Jaskolski worked on the Daniels matter only because NICB allowed him to do so and because it suited NICB's interest in preventing insurance fraud. There was no evidence that the government compelled, or had the authority to compel, Jaskolski to provide assistance or that the government had authority to countermand an NICB directive to Jaskolski not to work on the Daniels matter. Accordingly, as the district court correctly determined, Jaskolski's assistance to the government was purely "voluntar[y]" (A14), and either Jaskolski or NICB was always in control of what work Jaskolski would perform on any given day.[FN7]

FN7. Jaskolski argues that the district court's use of the term "coerce" as opposed to "control," is inconsistent with the law. Jaskolski Br. at 18-19. The concept the district court was getting at (as we are here by using the term "compel") is that, unlike the NICB, the government had no ability dictate where Jaskolski would work on any given day or what work he would do. See A14-15. Only NICB had that authority. That is what the district court meant by "coerce" and what we mean by "compel," and both formulations are consistent with *Logue* and *Orleans.*

Although Jaskolski acknowledges that the standard for determining whether an individual qualifies as an "employee of the government" for FTCA purposes is control and supervision over the day-to-day performance of an individual's work,[FN8] he fails to recognize that that level of supervision and control differs from what occurred here. What occurred here was Jaskolski's consent to assist the government because it suited NICB's interests. NICB allowed Jaskolski to assist on the Daniels case, but had the authority, which in fact it exercised, to compel Jaskolski to work on other matters. It could have pulled him away from his work on the Daniels matter at any time, and the government had no authority to countermand such an order. Thus, under *Logue/Orleans,* the government was not Jaskolski's employer for FTCA purposes.

FN8. See Jaskolski Br. at 31-32 ("The crucial question is *** whether [Jaskolski's] day-to-day operations

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

were supervised by the federal government.").

The cases cited by Jaskolski (Br. at 21-23, 32-34) to support his contention that he was a federal employee for FTCA purposes provide no help to him. Each of the cases is distinguishable and involved factors not present here. Indeed, to the extent the cases relied on factors not present here, the cases actually provide support for the government's position in this case.

*Ezekiel v. Michel, supra,* 66 F.3d 894, and *Costa v. United States,* 845 F. Supp. 64, 69 (D. Conn. 1994), involved physicians or residents "in training," whose employers or medical schools considered them "to be under the direct supervision and control of the [Veterans Administration's] medical staff *** while serving in that facility's training program." *Ezekiel,* 66 F.3d at 903. In contrast, there is no evidence here that NICB considered Jaskolski to be under the control of the government for the period in question. NICB merely allowed Jaskolski to assist the government; NICB could, and did, assign other work to Jaskolski and thus exercised to the exclusion of the government day-to-day control over the performance of Jaskolski's work.

*Cannady v. United States,* 155 F. Supp.2d 1379 (M.D. Ga. 2001), and *Thompson v. United States,* 504 F. Supp. 1087 (D.S.D. 1980), involved individuals whose day-to-day job performances were in fact controlled by the federal government. In *Cannady,* the individual was an employee of the Farm Service Agency, which was established by federal statute, was paid by the federal government, and was supervised by a federal government employee (the County Executive Director) in her day-to-day activities. 155 F. Supp.2d at 1382-83. In *Thompson,* the individual, although nominally a Tribal Council hire, was paid with funds from a federal program (the Comprehensive Employment Training Act or CETA), was actually hired and supervised by an official of the Bureau of Indian Affairs (a federal agency), and was subject to firing by the same official. 504 F. Supp. at 1089-90. None of these elements is present here.

In *B&A Marine Co., Inc. v. American Foreign Shipping Co., Inc.,* 23 F.3d 709, 711 (2d Cir. 1994), a written contract between a federal agency and the American Foreign Shipping Co. (AFS) specifically appointed AFS to act "as [the government's] agent, and not as an independent contractor." The court had no reason to go beyond the contractual language. *Id.* at 713.[FN9] No similar contract exists here.

FN9. Nevertheless, the court also found that the government in fact supervised AFS's day-to-day operations. *Id.* at 713-14.

Likewise, in *Bravo v. United States,* 403 F. Supp.2d 1182 (S.D. Fla. 2005), and *Martarano v. United States,* 231 F. Supp. 805 (D. Nev. 1964), written agreements explicitly provided that the government would supervise and control the day-to-day performance of the individual's work. In *Bravo,* the contract between a naval hospital and a physician-contractor established that the physician "shall be subject to the day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil services personnel engaged in comparable work." 403 F. Supp. 2d at 1191 ¶ 61. The court had no reason to go further than that. *Id.* at 1191-92 ¶¶ 61-66.[FN10] In *Martarano v. United States,*[FN11] the state and federal governments entered into a written cooperative agreement, pursuant to which a state employee was assigned by the state to work under the direct supervision and control of the federal government, and no state official or employee "directed or supervised *** the performance of [the state employee's] work" with the government. 231 F. Supp. at 807. The court thus held that the state employee was a federal employee for purposes the FTCA. Neither case compels a different result here because NICB did not agree in writing or otherwise to assign Jaskolski to the control and supervision of the federal government. NICB always retained the authority to direct and control the day-to-day performance of Jaskolski's work.

FN10. Prior to discussing the contract, the court noted that it was "unnecessary" to determine whether the physician was an "employee of the government" because of the liability attached to staff physicians as to whom there was no question of "employee" status. 403 F. Supp.2d at 1190-91 ¶ 56. See also *id.* at ¶ 55 (the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

question is “academic”). As a consequence, the discussion regarding the contract is probably dicta.

FN11. *Martarano* predates *Logue*. See n. 13, *infra.*

In *Bird v. United States*, 949 F.2d 1079 (10th Cir. 1991), a private placement agency provided a certified registered nurse anesthetist to work at, and under the supervision of, government medical staff at a government hospital. “No one contend[ed] that [the placement agency] exercised directly or indirectly any influence, control or review over the performance [of the employee],” and “there was no provision that [the employee] should not be considered an employee of the hospital.” 949 F.2d at 1084. See also *id.* at 1087 (“By no stretch of advocatory creativity could [the agency] reasonably be thought to have any control over [the employee] as he performed his duties at the government hospital.”). In addition, the employee “was required to work” on health service patients as directed by the medical staff. *Id.* at 1086. Here, Jaskolski was not “required to work” on government matters; he volunteered to do so in serving NICB's interests (see A14).[FN12]

FN12. See discussion, *infra*, at pp. 30-32.

It does not matter, therefore, that Jaskolski may have devoted almost all of his time to the Daniels matter after referring it to the FBI (see Jaskolski Br. at 32 n.5); the important point is that NICB, not the government, controlled the day-to-day performance of Jaskolski's work. NICB had the power to assign Jaskolski to other matters and pull him away from the Daniels matter if NICB deemed it necessary to NICB's work. To the extent NICB let Jaskolski participate in the Daniels matter it was because Jaskolski's participation served NICB's interests.[FN13]

FN13. Jaskolski also cites *United States v. Becker*, 378 F.2d 319 (9th Cir. 1967). *Becker* predates *Logue*, so it is of no help to Jaskolski's cause, especially because *Becker* relied on extensive federal regulation (see 378 F.2d at 322) to determine that the individual at issue was an employee of the government for FTCA purposes while *Logue* (and then *Orleans*) determined that federal regulation could not be dispositive of “employee” status. *Witt v. United States, supra*, n.5, and *Clifford v. United States*, 308 F. Supp. 957 (D.S.D. 1970), also predate *Logue*. See Jaskolski Br. at 20-22. *Witt* was essentially overruled by *Logue*. See n.5, *supra*. *Clifford*, moreover, provided a conclusory determination of the “employee” issue and thus provides no useful analysis.

b. Jaskolski argues that the district court's holding is tantamount to a conclusion that “Jaskolski was not subject to the government's control, but rather could have done everything according to his own judgment.” Jaskolski Br. at 30. The argument is a red herring because it misses the point of the *Logue/Orleans* analysis. As previously stated, Jaskolski's assistance was at the pleasure of NICB, which could have assigned him to other matters and, in fact, did so. See A7-8, A14-15, A263. The government had no authority to compel Jaskolski to provide assistance or to countermand an NICB directive to Jaskolski not to work on the Daniels matter. A14-15.

Relatedly, Jaskolski argues that the government must have exercised the requisite control to make him an employee for FTCA purposes because he did not “ha[ve] any discretion to investigate and prosecute Daniels” (Jaskolski Br. at 30) since those are activities “that only the government could do” (*id.* at 29). This aspect of Jaskolski's argument lacks merit. The logical extension of the argument is that, when it comes to providing assistance to the government with respect to tasks unique to the federal government (such as investigating and prosecuting violations of federal law), independent contractor status can never exist. The argument would thus appear to make every state, local, or private member of a “joint investigation” (A 153-54, A221) or joint task force with the federal government, a federal employee for FTCA purposes if the federal government leads or gives direction, even where the members of the task force or joint investigation act on behalf of, and are paid by, their state, local, or private employers and are subject to the day-to-day control of those employers as demonstrated by their authority to reassign their employees at any time.

*Dilger v. United States*, 696 F. Supp. 1071, 1074 (E.D. Va. 1988), is instructive on this point. Dilger was a retired military officer with expertise in arms development. He conceived an idea for a portable rifle with the ability to pierce

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tank armor. The Department of Defense supported the project, as did the Central Intelligence Agency, National Security Council, and members of Congress. Congress provided funding; the Department of Defense arranged for release of surplus ammunition to test the weapon; and, a member of a congressman's staff along with Army personnel arranged for the manufacture of more ammunition and released it to Dilger. While Dilger was on his way to demonstrate the weapon to government officials, the weapon accidently discharged causing a nearby gas pump to explode. When an FTCA action was filed to recover monetary damages for the explosion, the court was faced with the question of whether Dilger was a "person acting on behalf of a federal agency in an official capacity." *Dilger*, 696 F. Supp. at 1074. The Court stated that "well-established principles hold that a person does not act on behalf of a federal agency in an official capacity where, as here, there is no governmental authority to supervise the person's daily activities." *Id.*, citing *Logue v. United States*, 412 U.S. at 527-28. *Dilger* thus provides that an individual does not become an "employee of the government" for FTCA purposes just because he is jointly engaged with the United States in a project and the United States has considerable input into the completion of the project. *If* the individual's participation in the project is on behalf of his own interest or an interest separate and distinct from the government's, the individual will not be considered an "employee of the government" entitled to the shield of sovereign immunity.[FN14]

FN14. Jaskolski argues that *Dilger* is distinguishable. See Jaskolski Br. at 28. Jaskolski fails to recognize that, under *Dilger*'s analysis, the fact that an entity or individual is engaged in a "joint" or "team" effort with the government does not suffice to establish the entity or individual as an "employee of the government" for FTCA purposes.

**c.** Jaskolski argues that, under the Restatement (Second) of Agency (1958), the employment (or master-servant) relationship is defined in terms of a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act," Jaskolski Br. at 19, quoting Restatement, *supra*, at § 1, and that pursuant to that standard he is an employee of the government. Assuming that the Restatement controls, neither element of the definition is met here.

As to the first element (the master's consent to have the servant act on his behalf and subject to his control), aside from the fact that the government did not have control over Jaskolski's day-to-day performance of his work as required by *LoguelOrleans* (see discussion above), there is no evidence that the government consented to have Jaskolski act on its behalf. Neither Campbell nor Butler had the authority to hire Jaskolski, and there was no evidence that they did so or that Jaskolski had an employment or other contract with the government to symbolize an "official capacity" status. Jaskolski was simply a special investigator for the NICB, licensed in several states as necessary for his employment with the NICB (see A170-71), and neither Campbell nor Butler had authority to bestow an "official capacity" designation on Jaskolski or anyone else.

Moreover, nothing in the record indicates that Campbell or Butler authorized (or could have authorized) Jaskolski to hold himself out as a representative of the government. Indeed, to the contrary, when the Daniels trial started, Jaskolski was introduced as a representative of NICB, not the government. A7, A194, A313-15.

Nor did the certification under Rule 6(e), Fed. R. Crim. P., giving Jaskolski access to grand jury matter as "government personnel" (see Jaskolski Br. at 23, 25), allow Jaskolski to hold himself out as a representative or employee of the government. As the district court correctly ruled, "Rule 6' s 'government personnel' is not identical to the FTCA's 'employee of the government."' A12. Different standards apply. "Government personnel" is not defined in Rule 6(e), whereas "employee of the government" is defined in the FTCA. As a result, an individual can be considered "government personnel" for purposes of Rule 6(e), yet not be a representative or employee of the government for FTCA purposes. See, *e.g.*, *United States v. Pimental*, 380 F.3d 575, 591-96 (1st Cir. 2004). Thus, even if Jaskolski who is best described as an independent contractor or independent consultant, voluntarily providing assistance to the government could have been considered "government personnel" under Rule 6(e), that status would not entitle him to hold himself as a representative or employee of the government for FTCA purposes.

In any event, it has never been decided that Jaskolski was, in fact, "government personnel" within the meaning of Rule

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

6(e), and it is very likely that he was not. In litigation concerning discovery at an earlier stage of this case, in which the critical question was whether Jaskolski was "government personnel" for purposes of Rule 6, neither the district court nor this Court found Jaskolski to fall within the scope of that category. The district court stated that, although "[t]he question of whether Jaskolski is 'government personnel' is a close one[,] *** [i]t appears more likely than not that Jaskolski does not fit within this definition." A371-72. On appeal, this Court did not reach the question but held that Jaskolski was privy to grand jury information under the belief that he was "government personnel" so he could not reveal it whether such belief was right or wrong. *Jaskolski v. Daniels*, 427 F.3d 456, 459 (7th Cir. 2005).

In this connection, there is no merit to Jaskolski's claim that the government conceded that it treated Jaskolski as "government personnel." Jaskolski Br. at 25, citing A381. The government specifically stated that treating Jaskolski as "'government personnel' may not have been correct." A381. Based at least in part on that statement, the district court said that, rather than having Jaskolski sign a Rule 6(e) certification statement, "the Government probably should have sought an order from the Court permitting the disclosure, pursuant to Rule 6(e)(3)(E)(I)." A372.

Furthermore, Jaskolski's Rule 6(e) certification was merely an agreement that, if he participated in a federal investigation, he would not reveal any information made known to him during the grand jury investigation. The certification is not unlike a confidentiality agreement commonly used by the government in engaging consultants and experts who are in every sense independent contractors expressly excluded from employee status. 28 U.S.C. 2671 (first sentence).

As to the second element of § 1 of the Restatement (the servant's consent to be controlled), Jaskolski only consented to be controlled by the government to the extent that such control did not interfere with his work for NICB. As the district court correctly ruled, the government had no authority to compel Jaskolski to work for the government on any given day. A14.[FN15] Only NICB had that authority. Jaskolski's assistance was purely "voluntar[y]." *Id.* Though he may have followed all of the directions given him by Campbell and Butler (see Jaskolski Br. at 26, 27), he was under no obligation to do so.

FN15. See also n.7, *supra*, and accompanying text.

**d.** Jaskolski contends that a volunteer can be considered an "employee of the government." Jaskolski Br. at 32, citing *Beul v. ASSE Int'l, Inc.*, 233 F.3d 441, 444 (7th Cir. 2000). *Beul* is inapposite. The volunteer in *Beul*, in contrast to Jaskolski, was in fact a representative of the agency at issue, was paid expenses though not a salary by the agency, and was authorized by the agency to act on its behalf and to hold herself out as the agency's representative in placing foreign exchange students in U.S. homes. None of these factors was present here. No evidence was presented to show that the government paid any of Jaskolski's expenses or that Jaskolski was authorized by the government to act on its behalf or that he was authorized to hold himself out as a representative of the government.

Moreover, when Congress wants to provide immunity to volunteers, it knows how to do so. See, *e.g.*, 5 U.S.C. 3111(c)(1) (making unpaid student volunteers federal employees for FTCA purposes); 7 U.S.C. 2272(c) (same regarding volunteers for Department of Agriculture programs); 10 U.S.C. 1588(d) (same regarding certain volunteers to the Armed Services); 10 U.S.C. 2113(j)(4) (same regarding volunteers to Uniformed Services University of the Health Sciences); 15 U.S.C. 637(b)(1)(C)(i) (same regarding executives in volunteer programs to assist small businesses pursuant to the Small Business Act); 15 U.S.C. 4102(d)(1), 4105(5) (same regarding members of Arctic Research Commission and certain scientists and engineers acting as advisors to the Commission); 16 U.S.C. 18i(b) (same regarding certain volunteers to National Park Service); 16 U.S.C. 558c(b) (same regarding certain volunteers to Forest Service); 16 U.S.C. 565a-2 (same regarding Cooperators and their employees performing cooperative work under supervision of Forest Service); 16 U.S.C. 742f(c)(4) (same regarding volunteers to United States Fish and Wildlife Service or National Oceanic and Atmospheric Administration); 16 U.S.C. 4604(c)(2) (same regarding Take Pride in America Program volunteers); 22 U.S.C. 2504(h) (same regarding Peace Corps volunteers); 22 U.S.C. 5422(c)(2)(A) (same regarding volunteers to Department of Labor program regarding market transition in Poland and Hungary); 25 U.S.C. 2020 (same regarding volunteers to Bureau of Indian Affairs schools); 33 U.S.C. 569c (same regarding volunteers to Army Corps of Engineers); 42 U.S.C. 3788(g) (same regarding volunteers to the Office of Justice Pro-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

grams, the Bureau of Justice Assistance and the National Institute of Justice, and the Bureau of Justice Statistics); 42 U.S.C. 5055(b) (same regarding volunteers accepted pursuant to Domestic Volunteer Services Act); 43 U.S.C. 1737(f) (same regarding volunteers recruited to assist Secretary in activities accomplished through Bureau of Land Management). Therefore, in the absence of legislation, volunteers should not be deemed to be federal employees for FTCA purposes.

Jaskolski also contends that the government had the power to "fire" him. Jaskolski Br. at 30. What Jaskolski means is that the government had the power to decide not to use Jaskolski's assistance, which is not the same as "firing." See *Black's Law Dictionary 5th Ed.* at 570: to fire is "[t]o dismiss or discharge from a position or employment." Jaskolski clearly had no position with the government to be "fired" from, and as to the "employment" prong of the definition, Jaskolski would have to establish that he was an "employee" in order to establish that he was "fired." That makes the argument circular since the question presented here is whether he was an "employee."

Furthermore, if the ability to stop using an individual's assistance were the same as "firing" and if such a termination were dispositive of day-to-day control, we cannot imagine a case where an entity or individual who renders assistance to the government would not be an employee of the government for FTCA purposes. Jaskolski's argument simply proves too much.

**e**. Jaskolski argues that, although he "may have been working in a very limited fashion on other NICB files during the Daniels case," that factor "is *** of no moment" because the FTCA covers employees working for two employers or employees working temporarily for one employer while also employed by another. Jaskolski Br. at 32 (footnote omitted). The argument is based on the "borrowed" or "lent servant" doctrine discussed in the Restatement, *supra*, at § 227 ("A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services."). The Restatement explains that the same factors are used to determine employment status with respect to the first employer as the second. *Id.* cmt c. In other words, "[i]f *** the temporary employer exercises such control over the conduct of the employee as would make the employee his servant were it not for his general employment, the employee as to such act becomes a servant of the temporary employer." *Id.* cmt d. See also, *e.g.*, *Ezekiel v. Michel*, 66 F.3d at 903-04 n. 16; *Costa v. United States*, 845 F. Supp. at 69. As already demonstrated, the government did not exercise the requisite control over the day-to-day performance of Jaskolski's work so as to be considered Jaskolski's employer for FTCA purposes, whether permanent or temporary.

In sum, Jaskolski was not under the requisite day-to-day control of the government which would have qualified to make him an employee of the government for FTCA purposes.

**B. If This Court Reverses The District Court's Ruling, It Should Remand The Case To The District Court For A "Scope Of Employment" Determination.**

Assuming *arguendo* that the Court reverses the district court's ruling, a remand is necessary to allow the district court to determine whether Jaskolski's conduct was within the scope of his employment. Jaskolski contends that a remand is not necessary, see Jaskolski Br. at 39-40, but it is clear that the district court has never addressed this question, that the question raises an issue of fact, and that, for that reason, the district court should address it in the first instance. See, *e.g.*, *Taboas v. Mlynczak*, 149 F.3d at 582-83.

In addition, the district court should also determine in the first instance whether and to what extent the claims in Daniels' complaint address Jaskolski's conduct as an employee of the government and which claims relate solely to Jaskolski's conduct prior to his "employee" status. Jaskolski concedes that, assuming he was an employee of the government for some circumstances, he may *not* have been an employee in other respects. See Jaskolski Br. at 34-35 ("The United States *** must be substituted as a defendant for all claims based in any part on conduct *taken by-Jaskolskiunder the government's direction.* ") (emphasis added). See also *id.* at 38, citing *Ferguson v. United States*, 712 F. Supp. at 780-81, for the proposition that a "contractor could be agent or 'employee' for specified circumstances

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

while also serving as an independent contractor for other circumstances." Although Jaskolski argues that most of the claims in the complaint involve Jaskolski's conduct after he was acting at the direction of the government (see Jaskolski Br. at 35, and generally at 35-38), his argument concedes that Jaskolski was not always acting under the government's direction.

For the foregoing reasons, therefore, if the Court reverses the district court, a remand would be necessary. The district court must address two questions: first, which claims in Daniels' complaint address Jaskolski's conduct as an "employee of the government" for FTCA purposes[FN16]; and second, whether he was acting within the scope of his employment with respect to those claims.[FN17]

FN16. For example, Jaskolski did not refer the Daniels' matter to the FBI until April 1, 1999 (see A4, A37 ¶ 2), so it is possible that Daniels' claims based on Jaskolski's conduct prior to that date would not qualify for FTCA immunity.

FN17. If this Court reverses the district court, Jaskolski will be dismissed from the suit for the claims that fall within the FTCA immunity. See n.16, *supra*, and accompanying text. Because NICB's liability is based on the doctrine of *respondeat superior* (see Jaskolski Br. at 38-39), it, too, will be dismissed to the same extent Jaskolski is dismissed. The United States will be substituted as the proper defendant as to those claims. See 28 U.S.C. 2679. At some point after the United States is substituted, the United States will likely file a motion to dismiss based on the exemption in 28 U.S.C. 2680(h), which provides that the FTCA does not waive sovereign immunity for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" the Daniels' claims here unless the actor is a "law enforcement officer." "Law enforcement officer" is defined in Section 2680(h) as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." Because Jaskolski would not fall within the scope of the definition, the United States would appear to be entitled to dismissal based on the exemption.

**Conclusion**

For the foregoing reasons, the judgment should be affirmed. In the alternative, if the Court reverses the district court's decision, the case should be remanded in accordance with the discussion in Part B of this brief.

Joseph JASKOLSKI and the National Insurance Crime Bureau, Petitioners-Appellants, v. Alberto R. GONZALES, Attorney General of the United States, Joseph Van Bokkelen, United States Attorney for the Northern District of Indiana, and The United States of America, Respondents-Appellees.
2007 WL 178301 (C.A.7 ) (Appellate Brief )

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.